J-S21021-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KENNETH GERALD LUCHSINGER | |
| Appellant | No. 2093 EDA 2015 |

Appeal from the Judgment of Sentence October 28, 2014
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0003747-2014

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 17, 2016**

Kenneth Gerald Luchsinger appeals from his judgment of sentence, entered in the Court of Common Pleas of Bucks County, following his convictions for simple assault,[1] recklessly endangering another person ("REAP"),[2] false imprisonment,[3] and stalking.[4] After careful review, we affirm on the thorough opinion of the Honorable Albert J. Cepparulo.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2701(a)(1).

[2] 18 Pa.C.S. § 2705.

[3] 18 Pa.C.S. § 2903(a).

[4] 18 Pa.C.S. § 2709.1(a)(1).

In 2014, Luchsinger, who was 56 years old, was living in the home of his 78-year-old mother Geraldine Luchsinger (Mother). They had a contentious relationship, as evidenced by the fact that in 2007 and 2010, Mother obtained protection from abuse (PFA) orders against Luchsinger, and on March 31, 2011, Luchsinger was found guilty of simple assault and harassment against Mother.

In late 2013, following the expiration of the second PFA, Luchsinger moved back into Mother's home. As the trial court noted:

> In March of 2014, [Mother] fractured her hip after falling in the shower and [Luchsinger] helped her out of the bathtub. She had to undergo surgery and as a result she could not "get around too good." It was painful for [Mother] to walk around and she had to use a walker. [Luchsinger] helped her maintain the property during this time and occasionally cooked meals for her while she was in rehabilitation.
>
> On May 17, 2014, [Luchsinger] was still residing in [Mother's] residence. [Mother] was home sleeping in bed at approximately three (3) o'clock in the morning when she was awoken to her alarm system alerting her someone had opened her back door approximately six (6) times in a row. [Mother] made her way to the kitchen of her residence and saw [Luchsinger]. [Luchsinger] proceeded to lift her up by her back with both hands, which she testified caused pain in her neck. [Luchsinger] then pushed her over onto the hardwood kitchen floor. When [Mother] thereafter fell onto the kitchen floor, she also experienced pain in her hip. She was on the floor for approximately one (1) hour while Defendant continuously "yelled" at her and inquired as to why she "didn't love him" and accus[ed] her of loving her other son (who has since died) more. [Mother] testified that when [Luchsinger] accused her of this, she responded, "Yes. Billy always stuck up for me when your father was hitting me." When [Mother] would attempt to provide him with a response, he would yell "wrong answer" and stated, "if you don't give me the right answer, I'm going to put those dirty socks in your mouth."

[Luchsinger] then left the room momentarily and came back with two (2) socks and stuffed them into [Mother's] mouth by pushing her head back and twisting them around in an attempt to fit them. [Mother] testified she struggled and felt as though she was unable to breathe. [Mother] did not try to get up from the floor during this incident because she was "really afraid" of [Luchsinger] did not know what he would do next.

The assault concluded when [Luchsinger], while [Mother] was still sitting on the floor of the kitchen, went into the TV room and shut the door. [Mother] pulled herself up onto a chair and sat in the living room, as she was too scared to move further. She testified that around 7:00 A.M. [Luchsinger] went outside and cut the front lawn. Before [Luchsinger] left the residence to cut the grass, he stated, "I'm going to set you on fire, and I'll throw you back in the woods in this big hole back there." [Mother] testified that she was "scared to death" and, as a result, did not call police.

Prior to this assault, [Mother] did not have any injuries on her body aside from her hip. She sustained a scratch and bruising to her face, bruising on her rear, and bruising on her arm. [Mother] continues to suffer pain in her back as a result of this incident. She further testified that her hair was also forcefully pulled out by [Luchsinger].

Trial Court Opinion, 8/13/15, at 3-5 (citations omitted).

At the conclusion of a non-jury trial on October 28, 2014, the court convicted Luchsinger of the above referenced offenses, and imposed an aggregate sentence of 3 to 9 years' incarceration plus two years of probation.

Luchsinger filed timely post-sentence motions, which the court denied on May 29, 2015.

This timely appeal followed in which Luchsinger asserts that the evidence was insufficient to sustain a guilty verdict for simple assault, REAP, false imprisonment, and stalking.

Our standard of review in assessing a challenge of the sufficiency of the evidence is well-settled.

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt.

*Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013) (citation omitted).

"Any doubts concerning an appellant's guilt [are] to be resolved by the trier to fact unless the evidence was so weak and inconclusive that no probability of fact could be drawn therefrom." *Commonwealth v. West*, 937 A.2d 516, 523 (Pa. Super. 2007). "[T]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Perez*, 931 A.2d 703, 707 (Pa. Super 2007).

Our review of Judge Cepparulo's Rule 1925(a) opinion leads us to conclude that it thoroughly and comprehensively addresses the issues raised by Luchsinger, including the claim that he should be permitted to raise issues of ineffective assistance of counsel on direct appeal.

We affirm the judgment of sentence based on Judge Cepparulo's decision. We direct the parties to attach that decision in the event of further proceedings in the matter.

Judgment of sentenced affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/17/2016

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :   No. CP-09-CR-0003747-2014
    :   2093 EDA 2015
    :
    :
vs.     :
    :
KENNETH GERALD LUCHSINGER     :

## OPINION

### I.    INTRODUCTION

Appellant/Defendant Kenneth Gerald Luchsinger appeals to the Superior Court of

Pennsylvania from this Court's conviction and judgment of sentence. We file this Opinion

pursuant to Pennsylvania Rule of Appellate Procedure (Pa.R.A.P.) 1925(a).

### II.    FACTUAL AND PROCEDURAL BACKGROUND

On May 18, 2014, Defendant was charged with Simple Assault,[1] Recklessly Endangering

Another Person ("REAP"),[2] False Imprisonment,[3] Disorderly Conduct,[4] and two (2) counts of

Stalking.[5] All charges were held for Common Pleas court following a preliminary hearing which

took place on June 24, 2014.[6] The Criminal Information reflected only one (1) count of Stalking.

A Motion in Limine was filed by the Commonwealth on September 8, 2014 regarding

admissibility of Defendant's prior bad acts and convictions pursuant to Pennsylvania Rule of

Evidence ("Pa.R.E.") 404(b)(2).

---

[1] 18 Pa.C.S. § 2701(a)(1).
[2] 18 Pa.C.S. § 2705.
[3] 18 Pa.C.S. § 2903(a).
[4] 18 Pa.C.S. § 5503(a)(4).
[5] 18 Pa.C.S. § 2709.1(a)(1).
[6] An Aggravated Assault count (18 Pa.C.S. § 2702(a)(1)) was added to the Criminal Complaint at the Preliminary
Hearing but was dismissed thereafter by the Magisterial District Justice.

On October 1, 2014, Defendant filed a Petition for Writ of Habeas Corpus, arguing that the charges were improperly held for court as the Commonwealth's evidence was insufficient as a matter of law to establish a prima facie case. The Notes of Testimony from the preliminary hearing were attached to the motion.

On October 27, 2014, this Court heard pre-trial motions. Defendant's prior contacts and/or offenses regarding the victim in this case were recited on the record by the District Attorney. In 2007, Ms. Luchsinger (the complaining witness in this case) received a Protection from Abuse ("PFA") Order against Defendant which did not expire until September 4, 2010. N.T. 10/27/14, 40-41; Exhibit ("Exh.") CS-6-7. Both parties stipulated to the fact that Defendant was convicted of Simple Assault and Harassment on March 31, 2011 for crimes committed against Ms. Luchsinger.[7] N.T. 10/27/14, 38; Exh. CS-1. In 2010, the victim received a second PFA Order against Defendant which did not expire until 2013. N.T. 10/27/14, 27-28; Exh. CS-4-5. Defendant complied with the condition of both PFA Orders that he was not to have contact with Ms. Luchsinger during this time. N.T. 10/27/14, 40-41. Following review of the evidence presented to the Magisterial District Judge (including a Written Statement given by Ms. Luchsinger[8] and photographs depicting her injuries[9]), the Notes of Testimony from the preliminary hearing, as well as documentation of Defendant's prior conviction PFA petitions against him, relevant caselaw and argument from both counsel, we granted Defendant's Habeas Motion as to the Disorderly Conduct charged and dismissed the Motion as to the remaining charges. Furthermore, in terms of the prior conviction and PFA Orders, we granted that the

---

[7] The incident underlying the charges occurred on November 10, 2010. N.T. 10/27/14, 26.
[8] See Exh. CS-2.
[9] See Exh. CS-3.

Commonwealth could admit that evidence as substantive proof of the "course of conduct" element of the Stalking charge. N.T. 10/27/14, 69.

For purposes of trial, we ruled that the 2007 PFA application and Order were inadmissible on the basis of being unduly prejudicial pursuant to Pennsylvania Rule of Evidence ("Pa.R.E.") 403.

We proceeded with a waiver trial on Simple Assault, REAP, False Imprisonment and Stalking.

At trial, Ms. Luchsinger testified that beginning in November or December 2014, her son Defendant Kenneth Luchsinger, was residing with her at her residence located at 4615 Gary Drive in Bristol Township, Bucks County. N.T. 10/27/14, 79, 81. For the first couple of weeks of Defendant's residence, Ms. Luchsinger described that it was "okay." Id. at 82. Ms. Luchsinger testified that Defendant fixed the chimney and did chores around the house. Id. at 124. However, thereafter Defendant was "mean" to Ms. Luchsinger and would constantly yell at her, slam things around the house often causing damage and not permitting her to enter the TV room which he began to inhabit as his personal "apartment." Id. at 82-83, See Exh. C-8. The TV room was equipped with a back door leading to the exterior of the residence. Id. at 84.

In March of 2014 Ms. Luchsinger fractured her hip after falling in the shower and Defendant helped her out of the bathtub. Id. at 87. She had to undergo surgery and as a result she could not "get around too good." Id. at 85-86, 155. It was painful for Ms. Luchsinger to walk around and she had to use a walker. Id. at 86, 155. Defendant helped her maintain the property during this time and occasionally cooked meals for her while she was in rehabilitation. Id. at 126-27.

On May 17, 2014, Defendant was still residing in Ms. Luchsinger's residence. Id. at 79. Ms. Luchsinger was home sleeping in bed at approximately three (3) o'clock in the morning when she was awoken to her alarm system alerting her someone had opened her back door approximately six (6) times in a row. Id. at 87-88.[10] Ms. Luchsinger made her way to the kitchen of her residence and saw Defendant. Id. at 88. Defendant proceeded to lift her up by her neck with both hands, which she testified caused pain in her neck. Id. at 88, 91-92. Defendant then pushed her over onto the hardwood kitchen floor. Id. at 88, 91-92, 95, 137. When Ms. Luchsinger thereafter fell onto the kitchen floor, she also experienced pain in her hip. Id. at 95. She was on the floor for approximately one (1) hour while Defendant continuously "yelled" at her and inquired as to why she "didn't love him" and accusing her of loving her other son (who has since died) more. Id. at 95, 112. Ms. Luchsinger testified that when Defendant accused her of this, she responded "Yes. Billy[11] always stuck up for me when your father was hitting me." Id. at 112. When Ms. Luchsinger would attempt to provide him with a response, he would yell "wrong answer" and stated "If you don't give me the right answer, I'm going to put those dirty socks in your mouth." Id. at 95.

Defendant then left the room momentarily[12] and came back with two (2) socks and stuffed them into Ms. Luchsinger's mouth by pushing her head back and twisting them around in an attempt to fit them in. Id. at 96-97, See Exh. C-10. Ms. Luchsinger testified she struggled and felt as though she was unable to breathe. Id. at 97. Ms. Luchsinger did not try to get up from the floor during this incident because she was "really afraid" of Defendant and did not know what he would do next. Id. at 98-99.

---

[10] The alarm system does not automatically signal the security company or police when someone enters the back door, as the resident has to push a button in order to dial police. N.T. 10/27/14, 128-29.
[11] Ms. Luchsinger's other son.
[12] Ms. Luchsinger testified at this time she was afraid to move and "scared to death." N.T. 10/27/14, 137.

The assault concluded when Defendant, while Ms. Luchsinger was still sitting on the floor of the kitchen, went into the TV room and shut the door. Id. at 98. Ms. Luchsinger pulled herself up onto a chair and sat in the living room, as she was too scared to move further. Id. at 98, 107. She testified that around 7:00 a.m. Defendant went outside and cut the front lawn. Id. Before Defendant left the residence to cut the grass, he stated "I'm going to set you on fire, and I'll throw you back in the woods in this big hole back there." Id. at 99, 115. Ms. Luchsinger testified that she was "scared to death" and, as a result, did not call police. Id. at 99, 108.

Prior to this assault, Ms. Luchsinger did not have any injuries on her body aside from her hip. Id. at 99. She sustained a scratch and bruising to her face, bruising on her rear and bruising on her arm. Id. at 100-06, Exh. C-3. Ms. Luchsinger continues to suffer pain in her neck as a result of this incident. Id. at 106. She further testified that her hair was also forcefully pulled out by Defendant. Id. at 107.

Between 5:00 and 6:00 p.m. the victim's niece, Colleen Stasinchak, called the residence to ask if she needed any groceries. Id. at 108-09, 156. Ms. Stasinchak was also Ms. Luchsinger's power of attorney and checked in on her well-being on a weekly basis. Id. at 108, 154-55. She had witnessed Defendant yelling at her quite often since he moved back in. Id. at 167. After talking to Ms. Luchsinger, Ms. Stasinchak came to the residence, as she sensed something was wrong. Id. at 109, 156. She described Ms. Luchsinger as being "scared to death," repeatedly asking if Ms. Stasinchak had seen Defendant. Id. at 157. Ms. Luchsinger began showing Ms. Stasinchak the bruises she sustained from Defendant's assault and relayed to her specifically what happened. Id. at 157-58. Ms. Stasinchak saw the socks hanging on a bar stool in the TV room. Id. at 158.[13]

---

[13] These socks were photographed and admitted into evidence. See Exh. C-3, C-10.

Ms. Stasinchak called the police and Officer Thomas Van Winkle of the Bristol Township Police Department ("BTPD") responded. Id. at 161, 183-84. Ms. Luchsinger testified that at this point she was too upset to speak with him. Id. at 109, 161. Officer Van Winkle described Ms. Luchsinger's demeanor as follows:

> Very erratic, shaking to the point where I thought her arms and legs were going to fall off. I thought she was at the point of hyper-ventilation. I actually had to sit her down, get her under controlled breathing that we do with erratic witnesses, victims, complainants. That was taking several minutes. I asked her to take a sip of water, and I was still having so much trouble trying to get her to calm down.

Id. at 184. Officer Van Winkle observed a small cut on Ms. Luchsinger's face, a bruise on her lip, and two very large bruises on her bicep and tricep. Id. at 185. The officer did not take any pictures at this time because he was having difficulty getting information from Ms. Luchsinger. Id. at 186. He left his name and number for her if she wished to proceed with criminal charges. Id.

Ms. Luchsinger stayed at Ms. Stasinchak's residence the night of May 17, 2014. Id. at 110.

The next day, May 18, 2014, Ms. Luchsinger decided that she wanted to report to Officer Van Winkle Defendant's assaultive and abusive conduct. Id. at 110, 165. She asked Ms. Stasinchak to call police. Id. at 165, 187. Ms. Luchsinger explained that she was so nervous that she was unable to write and, accordingly, Officer Van Winkle took her account of what happened down on paper using her words. Id. at 110, 165, 188, 201-02. She signed the statement and adopted it as her own. Id. at 110-11. See Exh. C-2. Ms. Stasinchak also signed the statement attesting that she read the statement in full and the contents of which were an accurate account of what Ms. Luchsinger told Officer Van Winkle happened. Id. at 166.

Both Ms. Stasinchak and Officer Van Winkle took photographs of Ms. Luchsinger's injuries, as some of the areas to which injuries were sustained were private and Ms. Luchsinger felt more comfortable with Ms. Stasinchak taking some of the photographs. Id. at 113-14, 160, 189. Ms. Stasinchak took some of these photographs (the first too pages of Exh. C-3) the night of May 17th whereas Officer Van Winkle took the remaining photographs on May 18th. Id. at 161-63. The photographs display bruising that, in some small areas, had taken on a greenish-yellow hue. Id. at 143-45, Exh. C-3.

Later that night Officer Van Winkle received a phone call from Ms. Stasinchak informing him that Defendant was in the area. Id. at 193. Officer Van Winkle responded and found Defendant towards the end of Ms. Luchsinger's street coming out of a wooded area. Id. at 194. Officer Van Winkle checked to see if the warrant he had just filed was active and, upon receiving confirmation that it was, he took Defendant into custody. Id. He detected a strong odor of alcohol on Defendant's breath. Id.

On cross-examination, pursuant to her statement (Exh. C-3) Ms. Luchsinger did not inform Officer Van Winkle that Defendant grabbed her by her throat when she entered into the kitchen, as she was very confused and "the more time I had, I could think of everything he did." Id. at 130, 201-02. Further, Ms. Luchsinger did not provide police with the socks until the day before the trial, as they had remained in her residence until then. Id. at 132, 199-200. She informed this Court that there were periods in early 2014 where she fell down a couple times and, additionally, she had been having problems getting adjusted properly with her medication. Id. However, she testified the medicine was not the cause of these falls and that it did not make her dizzy. Id. at 132-33. Furthermore, she did not disclose Defendant's statement that he was going to burn her body and place it in the woods to Officer Van Winkle or the Magisterial

District Justice at her preliminary hearing. Id. at 140, 202-03. She explained that "I...couldn't remember everything. When you have time to sit and think of all that happened to you, that's when I thought about it." Id. at 150.

Ms. Luchsinger described the November 2010 incident with Defendant which precipitated a PFA Order[14] and criminal conviction of Simple Assault and Harassment,[15] in which Defendant forced Ms. Luchsinger to get up out of bed at 5:00 a.m. following a knee replacement surgery. Id. at 115-16, 120-21. She attempted to go into the bathroom but Defendant pushed her to the ground, near the toilet, and started stepping on her face. Id. at 116. She sustained bruising on her face, a swollen eye, bruising and scratches on her back and injury to her leg. Id. at 117. The PFA Order following this incident was effective from February of 2011 until February 8, 2013. Id. at 121, Exh. C-4, C-5. After the PFA Order expired she permitted Defendant to move back in with her because she "felt bad for him." Id. at 121-22.

Following a careful consideration of the evidence presented and a review of the applicable caselaw and relevant jury instructions, we found Defendant guilty on all counts.

On October 28, 2014, we proceeding with Sentencing. Upon consideration of the facts underlying Defendant's conviction, the Sentencing Guidelines, a domestic violence investigation report, Defendant's failure to take responsibility for his actions, as well as the evidence and argument submitted by both the defense and District Attorney, we sentenced Defendant to not less than two (2) nor more than seven (7) years' incarceration on Stalking[16] and a consecutive period of not less than one (1) nor more than two (2) years' incarceration on Simple Assault.[17]

---

[14] See Exh. CS-4, CS-5.
[15] See CS-1.
[16] The Sentencing Guidelines called for a sentence of not less than fifteen (15) nor more than twenty-one (21) months' incarceration in the standard range, nine (9) months' incarceration in the mitigated range, and twenty-seven (27) months' incarceration in the aggravated range.
[17] On Simple Assault, the Sentencing Guidelines recommended a sentence of not less than three (3) nor more than twelve (12) months' incarceration in the standard range and restorative sanctions ("RS") in the mitigated range.

On False Imprisonment, Defendant was sentenced to a two (2) year period of probation, to be served consecutive to his parole.[18] No further penalty was imposed on the remaining counts. Defendant was given credit for time served from May 17, 2014 to the date of sentencing and was ordered to complete a mental health and drug and alcohol evaluation and abide by any and all treatment recommendations.

On November 7, 2014, Defendant filed post-sentence motions in the form of a Motion for Reconsideration of Sentence, a Motion for a New Trial and/or An Arrest of Judgment, and a Motion Seeking Leave to File Additional Post-Sentence Motions. We held a hearing on the Motion for Reconsideration of Sentence on December 15, 2014. Following our conclusion that Defendant failed to present any additional mitigating evidence, we denied the motion.

In terms of the remaining motions, we took them under consideration pending the filing of the requisite Notes of Testimony from the waiver trial. After reviewing the Notes of Testimony, we issued an Order on May 29, 2015 denying the remaining post-sentence motions.

On June 25, 2015, Defendant filed his Notice of Appeal to the Superior Court.

## III.   MATTERS COMPLAINED OF ON APPEAL

Pursuant to this Court's June 26, 2015 Order, in his Statement of Matters Complained of on Appeal filed on July 1, 2015, Defendant raised the following issues, *verbatim*:

1) Whether the trial court erred in convicting the Appellant of simple assault and recklessly endangering another person given that:

    a. The incident between the Appellant and his mother, Geraldine Luchsinger, was not reported to police for over sixteen (16) hours.

    b. Geraldine Luchsinger changed her testimony on what happened during the incident while testifying at trial. Specifically, she stated the

---

[18] On False Imprisonment, the Sentencing Guidelines called for a sentence of restorative sanctions ("RS") to six (6) months' incarceration in the standard range and nine (9) months' incarceration in the aggravated range.

Appellant had picked her up by the throat and threw her to the ground and she testified that he threatened to kill her and bury her body in the woods. Neither of these statements were made to police or testified to at the preliminary hearing.

    c. Photographs entered into evidence by the Commonwealth show a yellowing of the bruise which was inconsistent with the injuries occurring within one to two days.

    d. Geraldine Luchsinger and Colleen Stasinchak both acknowledged that Geraldine would get dizzy from medication and had fallen, possibly accounting for her injuries.

    e. Police failed to follow up with any investigation at the house to show that Geraldine Luchsinger's account of what happened was true. Specifically, they did not follow up to see if the house alarm had gone off at 3:00 a.m., check the floor for hair which Geraldine stated was pulled from her head, and they did not check to see if the sock placed in her mouth had her DNA on it.

2) Whether the trial court erred in finding there was sufficient evidence to convict the Appellant of false imprisonment in that: There was no evidence Geraldine Luchsinger was held to the ground; prevented from getting up or prevented from leaving the kitchen.

3) Whether the trial court erred in convicting the Appellant of stalking in that:

    a. The prior incident of assault allowed in at trial occurred in 2010. He was prohibited from contact with her for three (3) years and he has never violated that PFA.

    b. The Appellant was allowed to live in the house by his mother in October of 2013.

    c. The Appellant was never asked to leave.

    d. The Appellant would prepare meals, make doctor's appointments, and help his mother around the house.

e.  The Appellant rescued his mother when she fell in the shower in March of 2014. He pulled her from the shower and summoned help.

f.  It was not until six (6) months after he was back in the house that this incident occurred.

g.  Convicting the Appellant of stalking for solely what occurred in the kitchen would amount to every assault in which there is more than one blow being a stalking.

## IV.  ANALYSIS

All issues on appeal constitute a challenge to the sufficiency of the evidence to support a conviction on all counts. As such, each claim will be addressed in turn.

The standard for reviewing a challenge to the sufficiency of the evidence is well-settled:

> In reviewing sufficiency of evidence claims, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such that every essential element of the crime is established beyond a reasonable doubt. Admittedly, guilt must be based on facts and conditions proved, and not on suspicion or surmise. Entirely circumstantial evidence is sufficient so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The fact finder is free to believe all, part, or none of the evidence presented at trial.

Commonwealth v. Moreno, 14 A.3d 133, 136 (Pa. Super. 2011) (internal citations omitted).

Because Defendant's claims detail two (2) specific seemingly inconsistent statements made by Ms. Luchsinger,[19] we feel it pertinent to set forth the applicable caselaw regarding the consideration and weighing of such statements as follows:

> Prior inconsistent statements, however, do not render a witness incompetent or require that [her] testimony be disbelieved. It is true, of course, that a conviction

---

[19] Although we feel these statements are more adequately characterized as undisclosed until the date of trial, we find the reasoning and rationale of the following caselaw relevant nonetheless.

cannot properly be sustained if it be based upon testimony of a witness which is so contradictory on the essential issues as to make the verdict obviously the result of conjecture or guess. However, the mere fact that there are some inconsistencies is not alone sufficient to destroy the Commonwealth's case. It is the function of the trier of the facts, in this case the trial judge, to reconcile conflicting testimony; the mere existence of conflicts in the testimony does not mean that he is required to resort to speculation.

Commonwealth v. Henry, 470 A.2d 581, 858 (Pa. Super. 1983) (internal citations omitted).

a) **Simple Assault**

Simple Assault is defined as follows:

**(a) Offense defined.--** Except as provided under Section 2702 (relating to aggravated assault), a person is guilty of assault if he:

(1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another

...

18 Pa.C.S. § 2701(a)(1). Bodily injury is defined as "Impairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. Caselaw dictates that "[i]n order to obtain a conviction for simple assault, the Commonwealth was required to demonstrate beyond a reasonable doubt that Appellant knowingly injured the victim." Commonwealth v. Torres, 766 A.2d 342, 344 (Pa. 2001). Moreover, where resulting bodily injury is not established by the Commonwealth, "it is sufficient to support a conviction if the Commonwealth establishes an attempt to inflict bodily injury" and "[t]his intent may be shown by circumstances, which reasonably suggest that a defendant intended to cause injury." Commonwealth v. Martuscelli, 54 A.3d 940, 948-49 (Pa. Super. 2012), citing Commonwealth v. Eckrote, 12 A.3d 383, 386 (Pa. Super. 2010).

At the outset, we note that we found Ms. Luchsinger's testimony wholly credible. Furthermore, her testimony is corroborated by her disclosure of the incident to Ms. Stasinchak later that same day. The fear Ms. Luchsinger experienced following the incident was evidenced

by her demeanor on the date of the incident as witnessed and later described by Officer Van Winkle, an experienced law enforcement officer, as uncontrollably shaking, erratic and she was close to the point of hyper-ventilation.

The evidence submitted by the Commonwealth was sufficient to establish that Ms. Luchsinger experienced bodily injury in the form of a scratch and bruising on her face, bruising on her rear, bruising on her arm, and pain in her neck caused directly by Defendant's assaultive campaign against her commencing on May 17, 2014 at approximately 3:00 a.m. Therefore, Defendant actually caused physical bodily injury to the victim. The fact that he continued his assaultive behavior for approximately one (1) hour and that he had knowledge that his mother had recently undergone major surgery indicates he was fully aware and intended to cause her bodily injury. Further, Defendant's actions in stuffing a sock down her throat also constitute an independent commission of simple assault, as Defendant forcefully cut off Ms. Luchsinger's airways, which could have resulted in unconsciousness or even death.

Addressing her inconsistent statements in the form of her failure to inform Officer Van Winkle or testify at the preliminary hearing to her trial testimony that Defendant threatened to burn her body and place it in the woods and picked her up by the neck following her entrance to the kitchen as a precursor to the remaining concentrated campaign to assault and terrify his own mother, we accept her explanation that at the time of the preliminary hearing she did not specifically remember these occurrences until her own subsequent independent reflection of the incident. Accordingly, her testimony was not internally so inconsistent as to render a verdict based thereon, in addition to corroborating testimony and evidence, a matter of conjecture or guess.

Additionally, in terms of the defense's argument to the yellowing in some of the bruises as being inconsistent with the injuries, we note following our review of the photographs admitted into evidence of Ms. Luchsinger's injuries (Exh. C-3), that only the very outer circumference of a few of the bruises show yellowing. Utilizing our own common knowledge and experience acting as the fact-finder in the instant case, and without the aid of expert testimony to the contrary, we recognized that these photographs were taken at least fifteen (15) hours after the incident and that every individual, oftentimes based on characteristics such as age and the distinct pressure/trauma which caused the bruise(s), heals from bruising in a distinct and individual manner. Moreover, the inner portion of these bruises were very dark. Furthermore, the bruises specifically were consistent with the victim's version of events, i.e., the bruises on her bottom were the result of her fall onto the kitchen floor following Defendant's shove and the bruises to her arm and face and small cut on her face were the result of Defendant holding her down and forcing the socks into her mouth. We found and do find here that Ms. Luchsinger's explanation of the cause of the bruises at the hands of Defendant was both credible and believable. Further, there was a marked absence of any defense evidence to the contrary.

Further, we note in passing that the lack of evidence pertaining to the house alarm, Ms. Luchsinger's hair or DNA evidence, although this evidence would have provided further corroboration, is simply not dispositive of the Simple Assault conviction. Additionally, although the socks were not initially collected and preserved as evidence, upon Ms. Stasinchak's arrival at the residence the night of the incident she noticed the socks hanging on a barstool in the living room area and took a photograph of them, both the socks themselves and the photograph were admitted without objection into evidence. See Exh. C-3, C-10.

Finally, although Ms. Luchsinger did admit and Ms. Stasinchak confirmed she had some initial difficulty with her medication, we find Ms. Luchsinger's testimony credible that dizziness from the medication did not cause any recent falls that would attribute any significant bruising and that the bruising was wholly caused by Defendant's assaultive behavior towards her.

Accordingly, we found that there existed sufficient evidence to find Defendant guilty of Simple Assault.

**b) REAP**

18 Pa.C.S. § 2705 provides an individual commits REAP where he/she "…recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. In examining a sufficiency of the evidence challenge pursuant to a REAP conviction, the Pennsylvania Superior Court in Martuscelli set forth the following:

> To sustain a conviction for recklessly endangering another person, 'the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so.' 'Danger, not merely the apprehension of danger, must be created.' 'The *mens rea* for recklessly endangering another person is 'a conscious disregard of a known risk of death or great bodily harm to another person.' '

54 A.3d at 949 (internal citations omitted).

At least three (3) of Defendant's separate actions independently constitutes the offense of REAP, including one (1) Defendant picking Ms. Luchsinger up by her neck upon her entrance into the kitchen, two (2) Defendant shoving Ms. Luchsinger onto the floor following hip replacement surgery and three (3) stuffing socks into Ms. Luchsinger's mouth to the point of

which she felt she was unable to breathe. Each of these incidents, based in part on her recent hip surgery, had the potential to cause serious bodily injury in the form of a protracted loss or impairment of Ms. Luchsinger's hip or her ability to property breathe, which could have foreseeably resulted in a loss of consciousness or death.

In response to the defense's more specific arguments made in terms of the sufficiency of the evidence claims for both Simple Assault and REAP pertaining to Ms. Luchsinger's inconsistent statements, yellowing of some of her bruises, dizziness sometimes caused by medication, and the police officer's failure to collect certain evidence, for the sake of brevity we rely on our statements set forth above as they relate to the Simple Assault conviction by extension.

### c) False Imprisonment

Pursuant to 18 Pa.C.S. § 2903(a), an individual commits False Imprisonment if: "he knowingly restrains another unlawfully so as to interfere substantially with his liberty." In examining a sufficiency of the evidence claim in relation to a False Imprisonment conviction, the Pennsylvania Superior Court has set forth as follows:

> In determining the magnitude of restraint necessary for false imprisonment, this Court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint. In determining whether the restraint at issue interfered with D.M.'s liberty "substantially," we give the word "substantially" its plain meaning. 1 Pa.C.S.A. § 1903 (words in a statute are to be construed according to rules of grammar and according to their common and approved usage). Thus, we determine the Legislature intended false imprisonment to cover restraints where an individual's liberty is interfered with in an ample or considerable manner. *See* Merriam Webster's Collegiate Dictionary 1174 (10th ed.1997).

In re M.G., 916 A.2d 1179, 1181-82 (Pa. Super. 2007) (internal citations and footnotes omitted).

The Superior Court found sufficient evidence existed to support a conviction of False Imprisonment in In re M.G., wherein Defendant snuck into the victim's bedroom, concealed himself behind the door while the victim was in the shower, and, once the victim reentered her room in a towel, Defendant shut and locked the door. 916 A.2d at 1182. Defendant then moved towards the victim, she attempted to resist by pushing him and Defendant began to assault her. Id. The Court reasoned that Defendant's actions were "ample enough to qualify as being a 'substantial interference'" with the victim's liberty because he stood between her and the door. Id. In making this determination, the Superior Court relied on its holding in Commonwealth v. Prince, 719 A.2d 1086 (Pa. Super. 1998), wherein the Court found that the Commonwealth presented sufficient evidence to support a conviction of Unlawful Restraint (in which the restriction of liberty must be more substantial than that of False Imprisonment). Id. In Prince, the Superior Court accurately summarized that the evidence was sufficient "where the victim lay near the appellant all night out of fear for her safety." Id. See Prince, 719 A.2d at 1087-89.

In the case *sub judice*, the factual circumstances are similar to that in In re M.G., in that Defendant forcefully shoved Ms. Luchsinger to the ground and continually verbally shouted at her as well as physically assaulted her while she was lying on the floor. The caselaw dictates that although Defendant was not physically holding her down the entire exchange preventing her escape, the crime of False Imprisonment encompasses such a psychological feeling or disposition of having one's freedom of movement restricted that, in this case, was triggered by present physical violence, a history of physical violence and otherwise threatening behavior, as well as Ms. Luchsinger's inability to adequately get away quick enough based on her recent surgery and resulting pain from her fall to the kitchen floor at Defendant's hands.

Accordingly, the Commonwealth presented sufficient evidence to support Defendant's False Imprisonment conviction.

d) **Stalking**

18 Pa.C.S. § 2709.1 defines the offense of Stalking as follows:

(a) **Offense defined.**--A person commits the crime of stalking when the person either:

> (1) engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent *to place such other person in reasonable fear of bodily injury **or** to cause substantial emotional distress to such other person*

> ...

18 Pa.C.S. § 2709.1(a)(1) (emphasis added). "Course of conduct" is defined by statute as

> A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. The term includes lewd, lascivious, threatening or obscene words, language, drawings, caricatures or actions, either in person or anonymously. Acts indicating a course of conduct which occur in more than one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct.

18 Pa.C.S. § 2709.1(f). Furthermore, "[c]ourse of conduct by its very nature requires a showing of a repetitive pattern of behavior." Commonwealth v. Urrutia, 653 A.2d 706, 710 (Pa. Super. 1995). In Commonwealth v. Leach it was established that "[c]ourse of conduct is established by proof of two related but separate events." 729 A.2d 608, 611 (Pa. Super. 1999).

In Urrutia, the Superior Court found sufficient evidence was submitted by the Commonwealth to prove Stalking beyond a reasonable doubt where the victim, following the end of a consensual romantic relationship, was forced to seek a PFA Order following Defendant's continued harassment and his later conduct in coming to the victim's residence and exhibiting violent behavior on two (2) separate occasions. 653 A.2d at 707-10.

In finding Defendant guilty of Stalking, we considered Defendant's conduct underlying the instant Simple Assault, REAP and False Imprisonment convictions coupled with his prior acts[20] precipitating the 2010 PFA Order and 2010 conviction of Simple Assault relating to abusive conduct against Ms. Luchsinger to constitute a course of conduct supportive of a Stalking conviction. Furthermore, such conduct has undoubtedly resulted in **both** bodily injury and severe emotional distress to Ms. Luchsinger, which was evident to this Court during her time testifying.

Although Defendant did abide by the no contact provisions relating to his 2010 conviction and 2010 PFA Order, we find that his behavior demonstrates that, despite Ms. Luchsinger's resort to the civil and criminal justice system in response to his abusive behavior, Defendant continually makes attempts to enter back into her life and, in doing so, he relentlessly exhibited predatory behavior which the Stalking statute was enacted to eviscerate.

Pursuant to established legal standards and, particularly, the General Assembly's clear definition of course of conduct, the fact that the victim let Defendant back into her life following his continuous abuse and prior PFA Order, criminal conviction, and no contact orders resulting therefrom, does not change the fact that Defendant's abusive acts against his mother were committed over an indeterminable period of time and this does not in and of itself prevent a conviction of Stalking.[21]

We also disagree with the defense's seemingly "slippery slope" contention, i.e. that a stalking conviction in this case indicates that "every assault in which there is more than one blow [would constitute] a stalking." See "Statement of Matters Complained Of On Appeal," 7/15/15,

---

[20] These prior acts were admissible to show a "course of conduct," an essential element of Stalking. See Commonwealth v. Urrutia, 653 A.2d 706, 709 (Pa. Super. 1995).

[21] We were unable to find caselaw relating to similar factual circumstances in which an abuser, following expiration of a no contact order, is voluntarily let back in by his/her abused and, thereafter, continues a campaign of abuse.

¶ 3(g). To the contrary, the instant case involves a continued campaign to abuse Ms. Luchsinger over a period of time and is not limited to a sole incident.

Finally, while we agree with the defense that Defendant did provide a certain amount of aid while living in Ms. Luchsinger's residence, this does not negate nor change the fact that he committed an assault on her during the early morning hours of May 17, 2014 and this assault was just one incident in a lengthy period of Ms. Luchsinger's abuse at the hands of Defendant.

Accordingly, Defendant's claims are without merit and the Commonwealth presented sufficient evidence to satisfy each and every element of Stalking beyond a reasonable doubt.

## I. CONCLUSION

The foregoing represents this Court's opinion regarding Defendant's appeal from his conviction and judgment of sentence.

BY THE COURT:

Date: August 13, 2015

_____
ALBERT J. CEPPARULO, JUDGE

**COMMONWEALTH OF PENNSYLVANIA VS. KENNETH LUCHSINGER**
**NO.  CP-09-CR-0003747-2014**

Copies sent to:


Joseph S. Haag, Chief Deputy Public Defender
Office of the Public Defender
BUCKS COUNTY JUSTICE CENTER
100 North Main Street, 1st Floor
Doylestown, PA 18901
*Attorney for Appellant*

Kate Kohler, ADA
Office of the District Attorney
BUCKS COUNTY JUSTICE CENTER
100 North Main Street, 2nd Floor
Doylestown, PA 18901
*Attorney for Appellee/Commonwealth*

Kelly Neff, **(via email only)**
LAW REPORTER

Barbara A. Morris,
Law Library

## PROOF OF SERVICE

I hereby certify that I served this day the foregoing documents upon the persons and in the manner indicated below, which service satisfies the requirements of Pa. R.A.P. 121:

Service in person
as follows:

Hon. Albert J. Cepparulo
(215) 340-8875
Judge's Chambers
Bucks County Justice Center
Doylestown, PA  18901

Kate Kohler
Assistant District Attorney
(215) 348-6344
District Attorney's Office
Bucks County Justice Center
Doylestown, PA  18901
Attorney for Appellee

DATED: _12/2/15_    BY: _Joseph S. Haag_
JOSEPH S. HAAG
CHIEF DEPUTY PUBLIC DEFENDER
ATTORNEY ID #59517
PUBLIC DEFENDER'S OFFICE
BUCKS COUNTY JUSTICE CENTER
DOYLESTOWN, PA  18901
(215) 348-6473
EMAIL: slspickler@buckscounty.org
ATTORNEY FOR APPELLANT