**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**James Marvin MARTUSCELLI, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 20, 2012.

Filed Oct. 4, 2012.

James M. Martuscelli, appellant, pro se.

Stefanie J. Salvantis, Assistant District Attorney, Wilkes Barre, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., OTT, J., and COLVILLE, J.*

OPINION BY STEVENS, P.J.

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Luzerne County following Appellant's conviction by a jury on the charges of aggravated assault, assault of law enforcement officer-(Police Officer Brent Brown), terroristic threats, two counts of simple assault, and recklessly endangering

* Retired Senior Judge assigned to the Superior Court.

another person.[1]  Contemporaneously with this appeal, Appellant's counsel has filed a petition to withdraw his representation and a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *Commonwealth v. Santiago*, 602 Pa. 159, 978 A.2d 349 (2009). After a careful review, we grant counsel's petition to withdraw and affirm Appellant's judgment of sentence.

The relevant facts and procedural history are as follows: Appellant was arrested and, represented by counsel, he proceeded to a jury trial on July 18, 2011.  At trial, Judi Smith, who was married to Appellant for thirty-five years, testified she and Appellant resided together in a house in Drums, Pennsylvania.  N.T. 7/18/11 at 26–27.  On July 10, 2009, at approximately 4:30 p.m., the couple went to the Nescopeck Gun Club, and upon their return home, Ms. Smith went upstairs to her bedroom.  N.T. 7/18/11 at 29.  At around 8:00 p.m., she heard what sounded like fireworks, and as she looked out of the bedroom window, she saw Appellant sitting on a stump.  N.T. 7/18/11 at 30–32.  Ms. Smith called out to Appellant, who turned towards her pointing a gun at his chest with a vacant look in his eyes.  N.T. 7/18/11 at 32, 36.  Ms. Smith asked Appellant to come inside of the house; however, she then noticed him speaking to a neighbor, Melvin Grovich.  N.T. 7/18/11 at 34.  Ms. Smith moved away from the window, and a short time later, she heard Appellant enter the house like a "bull-in-a-china shop."  N.T. 7/18/11 at 36.

Sensing danger, she ran and locked the door to Appellant's bedroom where Appellant stored his gun collection and ammunition.  N.T. 7/18/11 at 35–36.  Ms. Smith then locked herself in her bedroom and called 911.  N.T. 7/18/11 at 37–38.  At some point, Ms. Smith unlocked the door

to Appellant's bedroom and then she went back into her bedroom.  N.T. 7/18/11 at 38–39.  After a period of time, she safely left the house, and as she was doing so, she noticed Appellant was now in his bedroom.  N.T. 7/18/11 at 39–40.  Ms. Smith encountered police officers outside of her house and she said, "Please don't hurt [Appellant.]"  N.T. 7/18/11 at 41.

Carlyle T. Robinson, an emergency medical technician (EMT) who worked at the 911 call center, testified he was on duty on July 10, 2009, at 8:41 p.m., when he received a call from Ms. Smith.  N.T. 7/18/11 at 62–63.  Ms. Smith told EMT Robinson her husband was outside firing a gun into the woods, he had pointed a gun at his own chest, and she was in her bedroom unable to leave the house.  N.T. 7/18/11 at 63–68.  Ms. Smith then announced her husband had entered the house, and she hung up the phone.  N.T. 7/18/11 at 64–65.  EMT Robinson dispatched police to the residence.

Melvin Grovich testified he is Appellant's neighbor and, on July 10, 2009, he was sitting on his front porch when he heard gunshots.  N.T. 7/18/11 at 73–74.  Mr. Grovich yelled, "[Appellant], what the hell are you doing?"  N.T. 7/18/11 at 74.  Appellant replied, "Mel, is that you?"  N.T. 7/18/11 at 75.  After Mr. Grovich replied affirmatively, Appellant invited him to his backyard to talk. N.T. 7/18/11 at 75.  As Mr. Grovich approached Appellant, he noticed Appellant was holding a shiny object in his hand and he looked disturbed.  N.T. 7/18/11 at 75.  Appellant said to Mr. Grovich, "Mel, do you know how hard it is to commit suicide?"  N.T. 7/18/11 at 75.  Appellant then told Mr. Grovich he was scheduled to have an operation and he was afraid to live with a colostomy bag.  N.T. 7/18/11 at 75–76.  Appellant held out the

1.  18 Pa.C.S.A. §§ 2702, 2702.1, 2706, 2701,     and 2705, respectively.

gun and asked Mr. Grovich to shoot him. N.T. 7/18/11 at 76. When Mr. Grovich refused, Appellant indicated he was going to shoot over any responding police officers' heads in the hope that they would shoot him. N.T. 7/18/11 at 76. Appellant took a shot at a tree and then walked towards his house. N.T. 7/18/11 at 76. Mr. Grovich went back to his porch, and shortly thereafter, two police officers arrived at his door. N.T. 7/18/11 at 77. The officers told Mr. Grovich to go inside of his house, and Mr. Grovich told the police they should "get out of here and go home and come back tomorrow." N.T. 7/18/11 at 78. Mr. Grovich told the police Appellant was disturbed and "not right tonight." N.T. 7/18/11 at 78. The police then told Mr. Grovich he should evacuate his property, and Mr. Grovich acquiesced. N.T. 7/18/11 at 78.

Sugarloaf Township Police Officer Brent Brown testified he was familiar with Appellant's residence, and he had responded to prior calls at the residence regarding domestic incidents and suicide attempts. N.T. 7/18/11 at 84. At 8:40 p.m. on July 10, 2009, he received a dispatch to proceed to Appellant's house based on reports of shots being fired, a woman barricading herself in her home, and a man threatening suicide in his front yard. N.T. 7/18/11 at 84. Suspecting Appellant had various types of weapons, including assault rifles, in his residence, Officer Brown requested back-up officers and directed the surrounding residences be evacuated. N.T. 7/18/11 at 88–89. The police positioned themselves on Appellant's property tree line, and Officer Brent telephoned the residence. N.T. 7/18/11 at 90. Ms. Smith answered the call, indicating her husband was scaring her. N.T. 7/18/11 at 90. As Officer Brent discussed with Ms. Smith possible ways for her to escape, he suddenly saw her exit the house via the front door. N.T. 7/18/11 at 91. The police assisted Ms. Smith, and, shortly thereafter, Officer Brent observed Appellant walking around in front of his bedroom window. N.T. 7/18/11 at 96. Appellant yelled out, asking who was on the property. N.T. 7/18/11 at 97. Officer Brown identified himself, and he asked Appellant to put his gun down and come outside to talk. N.T. 7/18/11 at 97. Appellant responded, "Fuck you, I'm not coming out....This is going to be suicide by cop. It's my way or the highway." N.T. 7/18/11 at 97. Officer Brown replied, "[Appellant] come on, nobody wants that to happen." N.T. 7/18/11 at 97. Appellant responded, "Why don't you walk up in my driveway and I'll shoot you, and then once I shoot you, ... your buddies will have to kill me." N.T. 7/18/11 at 97. Officer Brown told Appellant "[n]obody wants that kind of hurt tonight," and Appellant said, "Brownie, I have to go; I have to go load two more mags." N.T. 7/18/11 at 100.

After approximately twenty minutes passed, at approximately 9:20 p.m., when it was dark outside, Appellant suddenly shone a spotlight, which was attached to a handgun, on the tree line where the police had taken their position. N.T. 7/18/11 at 102, 114. Officer Brown testified he "literally felt like a deer in headlights," and observed as Appellant panned the spotlight up and down the tree line. N.T. 7/18/11 at 102. Appellant suddenly turned the spotlight off and, in a split second, he started shooting a handgun from the window. N.T. 7/18/11 at 102–108. The officers returned fire, which lasted approximately five seconds, as Appellant receded to the side of the window. N.T. 7/18/11 at 106–107. The shooting ceased and Officer Brown yelled for Appellant to put his gun down and come out. N.T. 7/18/11 at 106. Appellant immediately started firing his weapon again, and the officers returned fire, again with Appellant receding to the

side of the window. N.T. 7/18/11 at 106–107. Officer Brown testified that, at the point Appellant began hiding himself when the police returned shots, he concluded Appellant's intent was not "suicide by cop;" but rather, he was intending to shoot the police. N.T. 7/18/11 at 109.

After the initial shooting ended, approximately ten minutes later, Appellant started firing at the police with an assault rifle and the police returned fire. N.T. 7/18/11 at 111–112. Officer Brown testified that, with each volley of shots, Appellant did not present his body in front of the window; but rather, while standing to the side of the window or kneeling from below, he would shoot the gun with just his arm and hand showing. N.T. 7/18/11 at 113. Officer Brown indicated he felt dirt kicking up in front of him from the bullets, and one bullet landed in a tree, which an officer was using for cover. N.T. 7/18/11 at 115.

After both sides ceased fire, and approximately an hour passed, Appellant came to the residence's front door and surrendered himself to the police. N.T. 7/18/11 at 118. Officer Brown testified the following conversation transpired as the police were taking Appellant into custody:

> He asked us how many of us he got. And one officer said, You didn't get any of us. And he said, You're fucking lying. He said, I had to get one of you; I had to get you. And we said, You didn't get one of us. And he said, if I would have got my .308, you guys would have been in trouble then.

N.T. 7/18/11 at 118.

Officer Brown indicated Appellant suffered a gunshot wound to his left ring finger and right arm. N.T. 7/18/11 at 119–120. He further indicated that, when bullets from Appellant's guns were "flying by" his head, he was concerned about his safety, as well as the safety of his fellow officers. N.T. 7/18/11 at 121. On cross-examination, Officer Brown testified that, in addition to the statement indicated *supra*, while Appellant was being taken into custody, he told the police "You guys are shitty shots. If you were better shots, I'd be fine." N.T. 7/18/11 at 125.

Butler Township Police Officer Eugene Rafalli testified he responded to the scene and assumed a position in the tree line with the other officers. N.T. 7/18/11 at 135–139. He confirmed Officer Brown began the encounter by attempting to get Appellant to surrender and leave his residence peacefully. N.T. 7/18/11 at 141. Officer Rafalli recollected that Appellant told Officer Brown he was not coming out, it was "his way or the highway," and he wanted the police to shoot him. N.T. 7/18/11 at 141. During this time, Office Brown continued to request that Appellant surrender peacefully, indicating nobody wanted to get hurt or hurt Appellant. N.T. 7/18/11 at 141. Suddenly, Appellant illuminated the darkness, panning an extremely bright light from officer to officer. N.T. 7/18/11 at 142. Appellant said, "I see you guys in the tree line; I'm going to shoot you." N.T. 7/18/11 at 142. At this point, Officer Rafalli sought cover behind a tree and, almost immediately, Appellant began shooting at the officers. N.T. 7/18/11 at 143. Officer Rafalli recalled rounds "flying over" the officers' heads and to their sides, as well as landing in the debris in front of them. N.T. 7/18/11 at 143. Officer Rafalli returned fire to "protect [him]self and his fellow officers." N.T. 7/18/11 at 143. Officer Rafalli confirmed Appellant, who used a handgun and rifle, and the officers exchanged fire numerous times. N.T. 7/18/11 at 143–145. He further confirmed that, "[t]he whole time [Appellant] was firing from angles of cover and using the angles of concealment," and the police continued to request that Appellant surrender. N.T. 7/18/11 at

145. Eventually, Appellant exited the front door, surrendered to the police, and spontaneously made statements indicating he was angry he had not shot any of the police officers. N.T. 7/18/11 at 145–147.

Hazleton City Police Corporal David Coffman testified he responded to the scene and assumed a position in the tree line with the other officers. N.T. 7/18/11 at 160–161. During Officer Brown's initial conversation with Appellant, prior to any gunfire, Corporal Coffman heard Appellant yell, "We're getting ready to have some fun. . . .We're going to dance soon." N.T. 7/18/11 at 162. He then made statements indicating that "it was going to be suicide by cop and he was going to take as many of us with him as possible." N.T. 7/18/11 at 162. He confirmed Appellant illuminated the officers with a bright light, and he described the ensuing gun battle. N.T. 7/18/11 at 163–170.

Pennsylvania State Police Trooper Thomas E. Slavin testified he photographed and processed the scene following the gun battle. N.T. 7/18/11 at 210. Specifically, he seized 32 spent cartridges, numerous loaded rounds of ammunition, and ten firearms, including a semiautomatic handgun with an attached flashlight, from the bedroom where Appellant was positioned during the gun battle. N.T. 7/18/11 at 211–216. Trooper Slavin testified he discovered impact marks from bullets in a large rock and trees in the area where the officers had been standing during the gun battle. N.T. 7/18/11 at 238–239.

Pennsylvania State Police Trooper Alan Pietkiewicz testified he questioned witnesses following the gun battle. N.T. 7/18/11 at 256. As part of the investigation, a secretary in the crises ward of the hospital, where Appellant was committed for mental and physical health reasons following the incident, informed the trooper Appellant told her he had followed police officers to their homes and was "looking to take them out." N.T. 7/18/11 at 258.

Frank M. Dattilio, a psychologist who the defense offered as an expert, indicated he evaluated Appellant on December 16, 2009, and January 20, 2010. N.T. 7/18/11 at 270. He opined Appellant suffered from major depression, post-traumatic stress disorder, and bipolar illness. N.T. 7/18/11 at 276. From 1985 to 2009, there were at least six or seven periods when Appellant was suicidal, including at the time of the July 10, 2009 incident. N.T. 7/18/11 at 277, 279. Dr. Dattilio opined, to a reasonable degree of medical certainty that, on the date of the instant incident, Appellant had a suicidal, as opposed to a homicidal, intent. N.T. 7/18/11 at 280–282.

On cross-examination, Dr. Dattilio admitted a person may have the contemporaneous intent to commit suicide, as well as kill others in the process thereof. N.T. 7/18/11 at 283–284. Dr. Dattilio further admitted that, prior to the instant incident, Appellant openly admitted he was angry at the police because, on a previous occasion, they had removed his guns from his home. N.T. 7/18/11 at 294.

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra*, and on September 16, 2011, the trial court sentenced Appellant to an aggregate of twenty years to forty years in prison. Appellant did not file post-sentence motions; however, he filed this timely counseled notice of appeal. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, and counsel filed a statement of intent to file an *Anders* brief in lieu of filing a Statement. *See* Pa.R.A.P. 1925(c)(4). Consequently, the trial court filed a Pa.R.A.P. 1925(a) opinion relying on counsel's Rule 1925(c)(4) statement without addressing any issues.

■ As noted above, Appellant's counsel has filed a petition to withdraw under *Anders*. When presented with an *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw. *Commonwealth v. Goodwin*, 928 A.2d 287, 290 (Pa.Super.2007) (*en banc.*) Before counsel is permitted to withdraw, he or she must meet the following requirements:

> First, counsel must petition the court for leave to withdraw and state that after making a conscientious examination of the record, he has determined that the appeal is frivolous; second, he must file a brief referring to any issues in the record of arguable merit; and third, he must furnish a copy of the brief to the defendant and advise him of his right to retain new counsel or to himself raise any additional points he deems worthy of the Superior Court's attention.

*Santiago*, 602 Pa. at 178–79, 978 A.2d at 361.[2]

In the case *sub judice*, our review of counsel's petition to withdraw, correspondence advising Appellant of his rights to proceed *pro se* or with privately-retained counsel,[3] and the *Anders* brief satisfies us that counsel has complied with all of the foregoing requirements. We, therefore, turn to the issue presented in counsel's *Anders* brief to make an independent judgment as to whether the appeal is, in fact, wholly frivolous. *Santiago, supra.*

■ Appellate counsel has presented a single issue, namely, whether the evidence was sufficient to support Appellant's convictions. Our standard of review of a challenge to the sufficiency of the evidence is well settled. In reviewing the sufficiency of the evidence, we view all the evidence admitted at trial in the light most favorable to the Commonwealth, as verdict winner, to see whether there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Clark*, 746 A.2d 1128 (Pa.Super.2000) (*en banc.*) "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Sanders*, 426 Pa.Super. 362, 627 A.2d 183, 185 (1993) (citation omitted). Although a conviction must be based on "more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty." *Commonwealth v. Badman*, 398 Pa.Super. 315, 580 A.2d 1367, 1372 (1990) (citation omitted). The trier of fact is free to believe all, some, or none of the testimony presented. *See Commonwealth v. West*, 937 A.2d 516 (Pa.Super.2007).

As indicated *supra*, Appellant was convicted of aggravated assault, assault of a law enforcement officer (Officer Brown), terroristic threats, two counts of simple assault, and recklessly endangering another person.

■ 18 Pa.C.S.A. § 2702(a)(1), pertaining to aggravated assault, provides, in relevant part, "[a] person is guilty of aggravated assault if he: (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S.A. § 2702(a)(1).

---

2. The requirements set forth in *Santiago* apply to cases where the briefing notice was issued after August 25, 2009, the date the *Santiago* opinion was filed. As the briefing notice in this case was issued after *Santiago* was filed, its requirements are applicable here.

3. Appellant has not filed a *pro se* brief or retained private counsel.

"For aggravated assault purposes, an 'attempt' is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another." *Commonwealth v. Gruff*, 822 A.2d 773, 776 (Pa.Super.2003). "Serious bodily injury" is defined under 18 Pa. C.S.A. § 2301 as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

Where the victim does not suffer serious bodily injury, the charge of aggravated assault can be supported only if the evidence supports a finding of an attempt to cause such injury. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. C.S.A. § 901(a). An attempt under Subsection 2702(a)(1) requires some act, albeit not one causing serious bodily injury, accompanied by an intent to inflict serious bodily injury. *Commonwealth v. Matthew*, 589 Pa. 487, 909 A.2d 1254 (2006). "A person acts intentionally with respect to a material element of an offense when … it is his conscious object to engage in conduct of that nature or to cause such a result[.]" *Id.* at 1257–58 (quotation omitted). "As intent is a subjective frame of mind, it is of necessity difficult of direct proof." *Id.* (citation omitted). The intent to cause serious bodily injury may be proven by direct or circumstantial evidence. *Id.*

18 Pa.C.S.A. § 2702.1, pertaining to assault of law enforcement officer, provides, in relevant part, that "[a] person commits a felony of the first degree who attempts to cause or intentionally or knowingly causes bodily injury to a law enforcement officer, while in the performance of

duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm." 18 Pa.C.S.A. § 2702.1(a). Recently, this Court held that, by its plain terms, under Subsection 2702.1(a), the Commonwealth must prove:

(1) the defendant attempted to cause, or intentionally or knowingly caused, bodily injury, (2) the victim was a law enforcement officer acting in the performance of his duty, (3) the defendant had knowledge the victim was a law enforcement officer, and (4) in attempting to cause, or intentionally or knowingly causing such bodily injury, the defendant discharged a firearm.

*Commonwealth v. Landis*, 48 A.3d 432, 445 (Pa.Super.2012) (*en banc*) (citation omitted).

18 Pa.C.S.A. § 2706, pertaining to making terroristic threats, provides, in relevant part, that "[a] person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1).

18 Pa.C.S.A. § 2701, pertaining to simple assault, provides, in relevant part, that "[a] person is guilty of assault if he: (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]" 18 Pa.C.S.A. § 2701(a)(1). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. The Commonwealth need not establish the victim actually suffered bodily injury; rather, it is sufficient to support a conviction if the Commonwealth establishes an attempt to inflict bodily injury. *See* 18 Pa.C.S.A. § 2701. This intent may be shown by circumstances, which reasonably suggest that a defendant intended to cause injury.

*Commonwealth v. Eckrote,* 12 A.3d 383, 386 (Pa.Super.2010).

18 Pa.C.S.A. § 2705, pertaining to recklessly endangering another person, provides that "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. C.S.A. § 2705. As indicated *supra,* "serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Commonwealth v. Hopkins,* 747 A.2d 910, 915 (Pa.Super.2000) (*citing* 18 Pa.C.S. § 2301). To sustain a conviction for recklessly endangering another person, "the Commonwealth must prove that the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so." *Id.* "Danger, not merely the apprehension of danger, must be created." *Id.* at 916. "The *mens rea* for recklessly endangering another person is 'a conscious disregard of a known risk of death or great bodily harm to another person.'" *Id.* (*citing Commonwealth v. Peer,* 454 Pa.Super. 109, 684 A.2d 1077, 1080 (1996)). "Brandishing a loaded firearm during the commission of a crime provides a sufficient basis on which a factfinder may conclude that a defendant proceeded with conscious disregard for the safety of other, and that he had the present ability to inflict great bodily harm or death." *Id.*

Viewing the evidence in the light most favorable to the Commonwealth, as we must under our standard of review, we conclude the evidence sufficiently supports Appellant's convictions. *See Clark, supra.* Specifically, the evidence reveals Appellant's wife telephoned 911 to report her husband was shooting several rounds of bullets into the woods, he had pointed a gun at his own chest, and she was unable to leave the house. Appellant's neighbor, Mr. Grovich, testified Appellant told him he was planning to shoot over any responding police officers' heads in the hope that they would shoot him.

Police Officer Brent Brown, who had reported to Appellant's residence for prior domestic incidents and suicide attempts, testified he and several other responding police officers positioned themselves along a tree line on Appellant's property, and, after Appellant's wife safely escaped the residence, the police encouraged Appellant to surrender himself. However, all of the testifying police officers reported that, despite Officer Brown encouraging Appellant to put his weapon down and end the incident peacefully, Appellant made various statements indicating he was seeking suicide by cop and intending to shoot as many police officers as possible during the process.

The police consistently testified that, as they stood in the tree line in the dark, Appellant suddenly illuminated them with a bright light, scanning up and down the tree line. Appellant turned the spotlight off and immediately started shooting into the tree line. The officers testified they felt and heard bullets whizzing by them, and, therefore, they returned fire; however, Appellant used angles of cover and concealment during this time. Eventually, after several volleys of back-and-forth firing between Appellant and the police, Appellant surrendered via the residence's front door. Although Appellant sustained a wound to his finger and arm, all of the police officers were uninjured.

Upon his surrender to police, Appellant asked how many police officers he had shot, and he was disappointed to learn none of the officers had been injured. Subsequently, in the hospital, Appellant

told a secretary in the crises ward he had followed police officers in the past and he was "looking to take them out." N.T. 7/18/11 at 258. Although Appellant's expert opined Appellant had a suicidal, as opposed to homicidal intent, on the night in question, the expert admitted that a person may contemporaneously have both intents.

Based on the aforementioned, we have no difficulty concluding the evidence sustains the jury's conviction of Appellant on the charges of aggravated assault, assault of law enforcement officer (Police Officer Brent Brown), terroristic threats, two counts of simple assault, and recklessly endangering another person.

Clearly, the intent of the legislature was to protect our law enforcement officers' safety in recognition of the daily potentially violent situations they encounter. *See* 18 Pa.C.S.A. § 2702.1. This Court will enforce that legislative intent.

Consequently, after an independent review of the appeal, we find Appellant's sufficiency of the evidence claim to be frivolous and we grant counsel's petition to withdraw.

Petition to Withdraw Granted. Judgment of Sentence Affirmed.