J-S02012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAYMOND BROWN, | |
| Appellant | No. 3378 EDA 2014 |

Appeal from the Judgment of Sentence October 31, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013921-2011, CP-51-CR-0013923-2011, CP-51-CR-0013924-2011

BEFORE:  SHOGAN, LAZARUS, and STABILE, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 23, 2016**

Appellant, Raymond Brown, appeals from the October 31, 2014 judgment of sentence entered following his conviction by a jury of aggravated assault, simple assault, recklessly endangering another person ("REAP"), terroristic threats, unlawful restraint, false imprisonment, possession of an instrument of crime ("PIC"), and two counts of endangering the welfare of a child.  Following our careful review, we affirm Appellant's convictions but vacate the judgment of sentence and remand for resentencing.

The trial court summarized the facts of the crimes as follows:

> In the late hours of March 21, 2011, Emmanuella Felix (age 26) (the victim) was watching television in bed in her mother's basement (where she resided at the time) while her two children, Rayanna . . . (age 3) and Christian . . .

(approximately age 1½ were laying in their beds preparing to go to sleep. On that evening [Appellant], who was the victim's former long-term boyfriend and the father of Rayanna and Christian, called the victim because he wanted to see the children and put them to bed. Though the victim and [Appellant] had separated in early 2011, the victim agreed to allow [Appellant] to come over. Shortly thereafter, [Appellant] went to the victim's home, entered the basement, and began to "get comfortable" by plugging his phone charger into the wall.

The victim asked [Appellant] what he was doing and [Appellant] responded that the two needed to talk. When the victim responded there was nothing to talk about, [Appellant] demanded the victim to take a ride in the car with him so they could talk. At that point Rayanna came over to her mother and the victim responded that "she was not going anywhere." [Appellant] became agitated and stated: "Well, we can either do this the hard way or we could do this the easy way." When the victim asked what [Appellant] meant, [Appellant] pulled out his loaded 9 mm Ruger pistol and pointed the gun at the victim's face. The victim then asked what [Appellant] was going to do. In response, he threatened to kill her. [Appellant] rambled about wanting to talk and then walked up to the victim, pointing the gun at her head. In doing so, [Appellant's] gun contacted the right side of the victim's head.

The victim called Rayanna over and held her because Rayanna was scared and shaking. At that time, the victim—in disbelief that [Appellant] was going to kill her—got up while holding Rayanna to turn off the television and wake her son Christian. The victim tried to leave the basement with her children but [Appellant] blocked the door and threatened her again, stating that "if [she] scream[ed], he's gonna kill everybody that was in the house."

After she put her daughter down, [Appellant] began to tussle with the victim, causing her to fall to her knees. [Appellant] walked up to the victim from behind, stood over the top of her back, and choked her with his arm around her neck. As [Appellant] choked the victim, she told Rayanna to run upstairs and get "grandma." [Appellant's] choking was so intense that the victim gasped for air and felt like she was going to faint. [Appellant] then warned her to "stop trying to fight it . . . You can't. You won't be able to get loose."

When Rayanna ran upstairs, she knocked on the door of her uncle, Mr. David Felix. Terrified, Rayanna said that "daddy's about to kill mommy." Mr. Felix went downstairs to help and, as he approached the basement, called out the victim's name. The victim told Mr. Felix "don't come because [Appellant] has a gun" and [Appellant] responded that the victim fell and needed help. As Mr. Felix walked down into the basement hallway and toward the victim's bedroom, it was pitch black. When he reached the victim's room, Mr. Felix flicked the lights on. Mr. Felix saw the victim lying on her back, with [Appellant] directly above her and his knees pressing against the top of her waist. Immediately thereafter, [Appellant] fired his gun multiple times. Mr. Felix ran from [Appellant] and the victim screamed "No. He's about to kill my brother."

After Mr. Felix fled, [Appellant] stood the victim up, continuing to strangle her neck. The victim's father and mother then came downstairs into the basement. As they entered the basement, they saw that Baby Christian was awake and crying. The victim's father asked [Appellant] "what are you doing?" and the victim asked her mother to get the baby. Seeking her baby's safety, the victim implored [Appellant] "don't, do anything. My mother is just gonna get the baby and go. . . I'll go wherever you want to go . . . Just let them go." The victim's parents then retrieved baby Christian and took him upstairs.

Once the victim's parents went upstairs, [Appellant] pulled the victim into the basement bathroom, and closed the bathroom door. In shock, the victim sat down by the tub and begged [Appellant] "Let's go for the ride. Let's go so we could talk." In response, [Appellant] said "it was already too late." Still holding his gun and blocking the bathroom door, [Appellant] told the victim "one of us is not gonna leave here alive." [Appellant] later stated that he was also going to commit suicide.

Meanwhile, as the victim was being held hostage at gunpoint in the basement, Mr. Felix called 911. On the 911 call, the victim's father can be heard pleading "Please, please, somebody come before somebody dies." Officers Shawn Willis of the Philadelphia Police Department and his partner were dispatched to the scene following the 911 call. Officer Willis approached the house and met with the victim's father, who told the officer that his daughter was in the basement with

- 3 -

[Appellant] and that [Appellant] had a gun. As Officer Willis walked up to the house, he immediately heard a gunshot and backed away from the door. Officer Willis was then informed by Mr. Felix that [Appellant] was in the basement with a gun and fired at him. Officer Willis called for backup from SWAT and secured the outside of the house. Numerous officers of the Philadelphia Police Department were dispatched to the house, including a six member SWAT team and two detectives.

When the SWAT team arrived, it secured the first and second floors of the house. The SWAT team then tried to talk to [Appellant] through the floor of the first floor until the hostage negotiators, Detectives [Joseph] Cremen and [Adam] McGuigan, arrived. Detectives Cremen and McGuigan arrived at the house at approximately 12:05 a.m. and initially spoke with the victim's family to get a layout of the house. At approximately 12:35 a.m., the detectives entered the house through the front door and began to speak (along with SWAT) to [Appellant] through the floor. Eventually, [Appellant] responded "What, what do you want?" and Detective Cremen tried to get [Appellant] to agree to speak with him on a cell phone. In the course of this conversation, [Appellant] (a military veteran) learned that Detective McGuigan had been in the marines. Agitated, [Appellant] screamed "Fuck the Marines, I hate the Marines."

After speaking with [Appellant] through the floor for another approximately forty minutes, [Appellant] agreed to speak with Detective Cremen on his cellphone and was willing to allow the victim to leave the basement. Detective Cremen asked the victim to come out and she responded, "No. He's gonna hurt himself if I leave." At approximately 1:23 a.m., Detective Cremen spoke with [Appellant] on his cell phone for approximately five minutes. Now more open to Detective Cremen's questions, [Appellant] explained to Detective Cremen that he was upset that he and the victim were breaking up. Approximately five minutes into the phone call, however, [Appellant] abruptly disconnected the line. Detective Cremen tried to call [Appellant] back but, while the phone was ringing, [Appellant] refused to answer.

Approximately five minutes later, at 1:28 am., the victim walked upstairs and was escorted by members of the SWAT team and Detective McGuigan out of the house. Within a minute after the victim got upstairs, [Appellant] shot himself. The

SWAT team tried to contact [Appellant] to see if he was hurt, but [Appellant] did not respond. At that point, the SWAT team went down into the basement. Once downstairs, SWAT Officer Frederick Buck saw that [Appellant] was slumped down and announced that [Appellant] was down. In response, [Appellant] screamed "Don't come the fuck down here. I still have a gun."

As the SWAT team approached [Appellant], [Appellant] was on his hands and knees in the basement bathroom with his gun in his hands. Officer Buck demanded repeatedly for [Appellant] to drop the gun but [Appellant] refused and pointed the gun at the SWAT team, which was now in the basement bedroom. Two gunshots were then fired, one gunshot from [Appellant's] gun and the other gunshot from Officer Buck's M4 rifle. [Appellant] was arrested, rendered emergency medical assistance, and transported to the hospital. [Appellant] suffered a gunshot wound to the right chest and a posterior wound to his head. In total, prior to [Appellant's] arrest while the Detectives were at the scene, [Appellant] was barricaded in the basement for approximately an hour and a half.

Later that evening, Detective Cremen interviewed [Appellant] in the hospital. [Appellant] waived his *Miranda* rights and signed a statement. In that signed statement, [Appellant] was asked: "Did you put out the weapon and point it at Emanuella during the argument?" [Appellant] responded: "Yes, because she didn't want me to kill myself." [Appellant] also admitted in the signed statement to shooting his gun five times.

In the basement, the police recovered [Appellant's] picture identification, cell phone, gun holster, and 9mm Ruger pistol. From inside the pistol, the police recovered four cartridges; one cartridge was recovered from the chamber of the gun and three were recovered from the magazine. After searching the basement, the police also recovered six fired cartridge casings (FCCs) and one bullet. Officer Robert Stott of the Firearms Identification Unit concluded to a reasonable degree of scientific certainty that the six FCCs and bullet were fired from [Appellant's] 9mm Ruger pistol. The hospital personnel removed a second nine millimeter bullet from [Appellant]. At trial, the Commonwealth and [Appellant] agreed that [Appellant] fired his pistol six times in the basement.

After [Appellant] was arrested but before his trial, the victim took Rayanna and Christian to visit [Appellant] in jail. In that visit, [Appellant] told the victim that he was sorry for what he did. While [Appellant] was in jail, [Appellant] also sent Mr. Felix multiple letters. In those letters, [Appellant] apologized to Mr. Felix for what he did and asked Mr. Felix to testify that [Appellant] did not shoot at him. Prior to the trial, Mr. Felix ripped up all but one of the letters and threw them in the trash. In the final letter, which Mr. Felix did not throw away, [Appellant] wrote "I have mailed off a few letters with prepaid return envelopes, but I have not received an answer as to the letters."

On the date that [Appellant] took the victim and her children hostage, the Commonwealth of Pennsylvania had not issued him a license to carry a firearm. In 2010, [Appellant] was issued a license to carry a concealed weapon or firearm by the state of Florida.

Trial Court Opinion, 6/25/15, at 4–10 (internal citations to the record omitted).

Following Appellant's jury trial that culminated on May 8, 2014, the trial court sentenced Appellant on October 31, 2014, to four and one-half to nine years in prison for aggravated assault with consecutive terms of six to twelve months in prison for simple assault, unlawful restraint, and terroristic threats. The court also imposed consecutive prison terms of nine to eighteen months for PIC and twenty-one to forty-two months for each count of endangering the welfare of a child. Thus, the aggregate sentence was ten

years, three months to twenty and one-half years of imprisonment.[1]   No further penalty was imposed for the remaining offenses.

On November 1, 2014, Appellant filed a post-sentence motion, and on November 3, 2014, he filed an amended post-sentence motion.  The trial court denied the motions on November 10, 2014.  Appellant filed this timely appeal, and the trial court ordered the filing of a statement pursuant to Pa.R.A.P. 1925.   Appellant, however, filed an untimely Rule 1925(b) statement.  "[W]here, as here, the trial court has addressed the issues raised in an untimely Rule 1925(b) statement, we need not remand and may address the issues on their merits."  *Commonwealth v. Veon*, 109 A.3d 754, 762 (Pa. Super. 2015), *appeal granted in part on other grounds*, 121 A.3d 954 (Pa. 2015).

Appellant raises the following issues in his brief on appeal:

> A. Did the trial court violate 42 Pa.C.S.§ 9765 by entering an illegal sentence for both aggravated assault and simple assault where the convictions were based upon the same criminal act and therefore merged for sentencing purposes?
>
> B. Did the trial court violate 204 Pa.Code § 303.10(a)(3) and improperly apply the deadly weapon enhancement to Appellant Brown's conviction for possession of an instrument of crime during sentencing?

---

[1]  The trial court incorrectly described the maximum aggregate sentence as twenty-one and one-half years.  Trial Court Opinion, 6/25/15, at 2; N.T., 10/31/14, at 38.

C. Did the jury improperly convict Appellant Brown where there was insufficient evidence of his intent to cause serious bodily injury in support of the aggravated assault conviction?

D. Did the jury improperly convict Appellant Brown where the verdict was contrary to the weight of the evidence at trial?

Appellant's Brief at 3 (full capitalization omitted). We will address the sufficiency and weight-of-the-evidence issues first and conclude with the sentencing issues.

Appellant asserts that the record evidence of his intent to cause serious bodily injury is insufficient to support his conviction for aggravated assault.[2] In reviewing a sufficiency challenge, "we must decide whether the evidence admitted at trial, and all reasonable inferences drawn therefrom in favor of the Commonwealth, as verdict winner," are sufficient to support all elements of the offense. *Commonwealth v. Hitcho*, 123 A.3d 731, 746 (Pa. 2015). The trial court, sitting as the finder of fact, is free to believe some, all, or none of the evidence. *Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007); *Commonwealth v. Tejada*, 107 A.3d 788, 792–793 (Pa.

---

[2] As noted by the trial court, "[b]ecause [Appellant] does not challenge the sufficiency of the 'attempt element,' but only the 'intent' element, a challenge to the 'attempt element' has not been preserved on appeal . . . ." Trial Court Opinion, 6/25/15, at 17 n.12 (citing *Commonwealth v. Garang*, 9 A.3d 237, 244–245 (Pa. Super. 1010)) ("The Appellant's 1925 statement must 'specify the element or elements upon which the evidence was insufficient' in order to preserve the issue for appeal"); *see also Commonwealth v. Matthew*, 909 A.2d 1254, 1259 (Pa. Super. 2006) (addressing the "attempt element" and the "intent element" of attempted aggravated assault under 18 Pa.C.S. § 2702(a)(1) separately).

Super. 2015), *appeal denied*, 119 A.3d 351 (Pa. 2015). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Roberts**, ___ A.3d ___, ___, 2016 PA Super 22, at *5 (Pa. Super. filed February 2, 2016) (quoting **Commonwealth v. Brooks**, 7 A.3d 852, 856–857 (Pa. Super. 2010)). As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. **Commonwealth v. Rogal**, 120 A.3d 994 (Pa. Super. 2015).

Appellant was convicted of aggravated assault under 18 Pa.C.S. § 2702(a)(1), which provides as follows:

**Aggravated assault**

**(a) Offense defined.**--A person is guilty of aggravated assault if he:

> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

18 Pa.C.S. § 2702(a)(1). "Serious bodily injury" is defined as: "Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. "The intent to cause serious bodily injury may be proven by direct or circumstantial evidence." **Commonwealth v. Martuscelli**, 54 A.3d 940, 948 (Pa. Super. 2012).

Here, the testimony at trial established that when the victim refused to take a ride with Appellant, he pointed his gun at the victim's face.  N.T., 4/23/14, at 84.  He threatened the victim, stating, "We can do this the easy way or the hard way."  *Id*. at 83.  Appellant walked over to the victim and put the gun to her right temple, touching her head.  *Id*. at 85.  Appellant threatened to kill the victim and "everybody that was in the house."  *Id*. at 131.  These actions are clearly sufficient to show intent to inflict serious bodily injury.

As noted, Appellant has preserved only a challenge to the intent element.  "For aggravated assault purposes, an 'attempt' is found where the accused, with the required specific intent, acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another."  *Martuscelli*, 54 A.3d at 948.  We reject Appellant's self-serving explanation that he intended only to commit suicide.  Such claim is contradicted by Appellant's threat to kill the victim and his action in pointing a loaded gun to her head.  We have no hesitation in concluding that Appellant's actions illustrated his intent to cause serious bodily injury, and we conclude the evidence was sufficient to sustain the conviction.

Appellant also assails the weight of the evidence.  Appellant preserved this issue by filing a post-sentence motion for a new trial pursuant to Pa.R.Crim.P. 607(A).  Post-sentence Motion, 11/1/14, at unnumbered 2; Amended Post-sentence Motion, 11/3/14, at unnumbered 2.

"When the challenge to the weight of the evidence is predicated on the credibility of trial testimony, our review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004). "Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003). "Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Id.* (citing *Commonwealth v. Tharp*, 830 A.2d 519, 528 (Pa. Super. 2003)) (citations omitted).

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. . . .

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)). "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Commonwealth v. Diggs*, 949 A.2d 873, 879-880 (Pa. 2008).

- 11 -

Appellant, who raised the issue in his post-sentence motions, merely reiterates on appeal the claim he made in his sufficiency-of-the-evidence argument that his threats and interactions with the victim "demonstrated his intent to commit suicide and not to cause serious bodily injury." Appellant's Brief at 50. This claim is specious in light of his actions in threatening to kill the victim and placing a gun to her temple. The trial court stated as follows:

> Three witnesses testified to what happened when [Appellant] took the victim and her children hostage in the basement: [Appellant], the victim, and Mr. Felix [Appellant's brother]. [Appellant's] weight of the evidence challenge therefore seems to be based on the premise that the jury should have believed [Appellant's] story that he went over to the victim's house solely for the purpose to kill himself but not to harm the victim and her children[,] over the victim's and Mr. Felix's account[s] that [Appellant] held the .victim hostage at gunpoint in her basement while he threatened to kill her and her family multiple times. (N.T. 04/23/14 at 61–139) (the victim's testimony); (NT. 04/23/14 at 143–225) (Mr. Felix's testimony); (N.T. 04/29/14 at 31–133) ([Appellant's] testimony). Such a challenge is entirely improper in a weight of the evidence claim. It is well settled in a weight of the evidence claim that a court may not substitute its judgment as to the credibility of the witnesses for that of the trier of fact. *See* [*Commonwealth v.*] *Gibbs*, 981 A.2d [274] at 282 (Pa. Super. 2009). Thus, this Court properly denied [Appellant's] weight of the evidence challenge.

Trial Court Opinion, 6/25/15, at 20.

The trial court declined to grant Appellant a new trial. We agree that the verdict was amply supported by competent evidence. Appellant's argument is nothing more than a veiled attempt to have this Court re-weigh the evidence and substitute our judgment for that of the jury, which is wholly improper. **Commonwealth v. Ramtahal**, 33 A.3d 602, 609 (Pa.

2011). Having reviewed the record in its entirety, we discern no abuse of discretion with respect to the trial court's rejection of Appellant's weight-of-the-evidence claim.

Next, we address Appellant's contention that the trial court imposed an illegal sentence because it imposed separate consecutive terms of imprisonment for aggravated assault and simple assault. Appellant asserts the convictions were based upon the same criminal act and therefore merged for sentencing purposes. In its Pa.R.A.P. 1925(a) opinion, the trial court, with minimal discussion, agreed with Appellant and requested this Court to vacate and remand for resentencing.

A claim that sentences should have merged is "a non-waivable challenge to the legality of the sentence." *Commonwealth v. Lomax*, 8 A.3d 1264, 1267 (Pa. Super. 2010) (citing *Commonwealth v. Martz*, 926 A.2d 514, 525 (Pa. Super. 2007)). Further, "[a] claim that the trial court imposed an illegal sentence by failing to merge sentences is a question of law." *Commonwealth v. Duffy*, 832 A.2d 1132, 1137 (Pa. Super. 2003) (quoting *Commonwealth v. Collins*, 764 A.2d 1056, 1057 n.1 (Pa. 2001)). Thus, although the trial court agreed that Appellant was entitled to relief on this issue, this Court is not bound by the trial court's conclusions of law. *Commonwealth v. Quintua*, 56 A.3d 399, 400 (Pa. Super. 2012) (When reviewing "[a] claim that crimes should have merged for sentencing purposes," the "standard of review is *de novo*.").

Section 9765 of our Judicial Code provides as follows:

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. "The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." *Commonwealth v. Baldwin*, 985 A.2d 830, 833 (Pa. 2009); *accord Commonwealth v. Wade*, 33 A.3d 108 (Pa. Super. 2011) (42 Pa.C.S. § 9765 prohibits the merger of sentences unless a strict two-part test is met; the convictions must be based on a single criminal act, and all of the statutory elements of one of the offenses must be included in the statutory elements of the other); *Commonwealth v. Tanner*, 61 A.3d 1043, 1046 (Pa. Super. 2013) (same).

The objective of the merger doctrine is to prevent a defendant from being punished more than once for one criminal act. *Commonwealth v. Davidson*, 938 A.2d 198, 217 (Pa. 2007). It is a rule of statutory construction designed to determine whether the legislature intended for the punishment of one offense to encompass that of another offense arising from the same criminal act or transaction. *Commonwealth v. Collins*, 764 A.2d 1056, 1057 (Pa. 2001). Our Supreme Court has recognized:

- 14 -

The question of when sentences should merge is not an easy problem . . . . Analytically, the problem concerns whether a single criminal plan, scheme, transaction or encounter, which may or may not include many criminal acts, may constitute more than one crime, and if it may constitute several crimes, whether each criminal conviction may be punished separately or whether the sentences merge.

*Commonwealth v. Anderson*, 650 A.2d 20, 21 (Pa. 1994). Our Supreme

Court explained:

Our concern . . . is to avoid giving criminals a "volume discount" on crime. If multiple acts of criminal violence were regarded as part of one larger criminal transaction or encounter which is punishable only as one crime, then there would be no legally recognized difference between a criminal who robs someone at gunpoint and a criminal who robs the person and during the same transaction or encounter pistol whips him in order to effect the robbery. But in Pennsylvania, there is a legally recognized difference between these two crimes. The criminal in the latter case may be convicted of more than one crime and sentences for each conviction may be imposed where the crimes are not greater and lesser included offenses.

*Id*. at 22. *See also Commonwealth v. Belsar*, 676 A.2d 632, 634 (Pa.

1996) (merger not to be "volume discount" for multiple criminal acts).

The instant record belies Appellant's contention that these two crimes

merge for sentencing under these facts. *See Anderson*, 650 A.2d at 24 n.3

("[A]ny merger analysis must proceed on the basis of its facts."). Our

review of the notes of testimony compels our conclusion that there was a

separate assault to the victim subsequent to and apart from the threat to

shoot the victim and the placement of the gun to the victim's temple.

We held, *supra*, that the Commonwealth presented sufficient evidence

of Appellant's intent to inflict serious bodily injury and attempt to commit

- 15 -

aggravated assault when he threatened to kill the victim and everyone in the house and held the muzzle of his gun to the victim's temple. The record also reflects sufficient evidence of a subsequent assault when Appellant thereafter grabbed the victim, knocking her to the ground, and began to choke her.[3] N.T., 4/23/14, at 87.

This Court has held that simple assault is a lesser included offense of aggravated assault. **Commonwealth v. Feaser**, 723 A.2d 197 (Pa. Super. 1999). As such, where the charges are based upon the same conduct, simple assault merges into aggravated assault. Thus, in the present case, if the simple assault conviction and the aggravated assault conviction were predicated upon the same criminal conduct or act, namely, Appellant's act of threatening to kill the victim and pointing the gun to her head, merger would be dictated. However, here, as the victim tried to flee, Appellant blocked her way. N.T., 4/23/14, at 86. Appellant subsequently grabbed the victim from behind, causing her to fall to the floor. **Id**. at 87. After the victim's daughter ran from the room, Appellant started choking the victim with his arm around her neck. **Id**. at 89. The victim stated that she thought she "was gonna pass out" because she "couldn't breathe." **Id**. at 90. Thus,

_____

[3] The jury's guilty verdict of simple assault related to Emmanuella Felix, the victim. N.T., 5/8/14, at 5. Appellant was found not guilty of simple assaults relating to his son and daughter. **Id**. at 6, 7.

while the aggravated and simple assaults occurred during the same criminal episode, Appellant engaged in distinct acts that constitute separate assaults.

*Commonwealth v. Pettersen*, 49 A.3d 903 (Pa. Super. 2012), is instructive. We stated therein:

> When considering whether there is a single criminal act or multiple criminal acts, the question is not "whether there was a 'break in the chain' of criminal activity." [*Commonwealth v. Robinson*, 931 A.2d 15, 24 (Pa. Super. 2007)] (quoting *Commonwealth v. Wesley*, 860 A.2d 585, 592 (Pa. Super. 2004)). This issue is whether "the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes." *Commonwealth v. Belsar*, 544 Pa. 346, 676 A.2d 632, 634 (1996) (quoting *Commonwealth v. Weakland*, 521 Pa. 353, 555 A.2d 1228, 1233 (1989)).

*Id*. at 912.

We have no reservation in concluding that Appellant engaged in at least two separate criminal acts; one independently fulfilled the elements of aggravated assault and one fulfilled the elements of simple assault. As in *Pettersen*, "[a]lthough the time between the separate acts was relatively short," the assaults were committed differently to distinct parts of the victim's body. *Pettersen*, 49 A.3d at 912. When Appellant threatened to kill the victim and everyone else in the house, placed the gun to her head with the muzzle against her temple, he completed an attempt to commit aggravated assault. When Appellant tussled with the victim, knocking her to the ground and placed a choke-hold around her neck, he completed another assault. *See Commonwealth v. Emler*, 903 A.2d 1273, 1278 (Pa. Super.

- 17 -

2006) (evidence was sufficient to prove simple assault where the defendant grabbed the victim from behind, began to choke him, and "us[ed] his much heavier body to pin the victim to the ground"). "Appellant is not entitled to a volume discount for these crimes simply because he managed to accomplish all the acts within a relatively short period of time." **Pettersen**, 49 A.3d at 912 (citing **Anderson**, 650 A.2d at 22). Because the record herein reflects that the aggravated assault and simple assault did not arise from a single criminal act, the first prong of the merger test has not been met, and the merger test fails. Consequently, we hold that Appellant was not entitled to have his simple assault conviction merge with his aggravated assault conviction for purposes of sentencing.

We address Appellant's final issue, that the trial court improperly applied the deadly weapon enhancement to Appellant's conviction for PIC. This claim challenges the discretionary aspects of Appellant's sentence. "A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal[.]" **Commonwealth v. Rhoades**, 8 A.3d 912, 916 (Pa. Super. 2010). **See also Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1266 (Pa. Super. 2014) (*en banc*) (imposition of the deadly weapon enhancement is a challenge to the discretion of the trial court, not to the legality of the sentence); **Commonwealth v. Archer**, 722 A.2d 203, 211 (Pa. Super. 1998) ("[A]ny misapplication of the Sentencing Guidelines constitutes a challenge to the discretionary aspects of sentence.").

As Appellant recognizes, such a challenge is not subject to our review as a matter of right. "An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence," by (1) preserving the issue in the court below, (2) filing a timely notice of appeal, (3) including a Rule 2119(f) statement, and (4) raising a substantial question for our review. *Commonwealth v. Tejada*, 107 A.3d 788, 797 (Pa. Super. 2015) (citation omitted); *Commonwealth v. Austin*, 66 A.3d 798, 808 (Pa. Super. 2013).

Applying the four-part analysis to the instant case, we find that (1) Appellant timely filed his notice of appeal on November 24, 2014; (2) Appellant preserved the issue;[4] and (3) Appellant has complied with Pa.R.A.P. 2119(f) by including in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Appellant's Brief at 26–31. Acknowledging that "the

_____

[4] We acknowledge the Commonwealth's argument that Appellant failed to preserve the issue, thereby depriving the trial court of the opportunity to correct its error. Commonwealth Brief at 13–16. Indeed, the Commonwealth advances only a waiver argument and fails to address the merits of the issue. Herein, at the sentencing hearing, Appellant asserted that the deadly weapon enhancement did not apply to any of the convictions, thus preserving the issue. *Commonwealth v. Swope*, 123 A.3d 333, 337 (Pa. Super. 2015) (stating that before this Court can address a discretionary challenge, an appellant must, *inter alia*, "preserve[] [the issue] at sentencing or in a motion to reconsider and modify sentence."). Although Appellant's argument was general rather than specific, and the assertion of the claim could have been clearer and more succinct, we do not find that the issue is waived.

determination of what constitutes a substantial question must be evaluated on a case-by-case basis," **Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa. Super. 2013), we note that this Court has held that the application of the deadly weapon enhancement presents a substantial question. **See e.g.**, **Rhoades**, 8 A.3d 912. We therefore proceed to address the merits of Appellant's claim.

With respect to the question of whether the trial judge erred in finding that the Deadly Weapon Enhancement applied to this case, we must examine the controlling section of the Pennsylvania Code:

§ 303.10 Guideline sentence recommendations: enhancements

(a) *Deadly Weapon Enhancement*.

* * *

> (3) There shall be no Deadly Weapon Enhancement for the following offenses:
>
> > (i) Possessing Instruments of Crime

204 Pa.Code § 303.10(a)(3)(i).

The use of the word "shall" evinces the mandatory nature of the nonapplicability of the enhancement to the particular crime. **See Commonwealth v. Patterson**, 940 A.2d 493, 499 (Pa. Super. 2007) (stating "shall" evinces mandatory nature of notification); **Commonwealth v. Pleger**, 934 A.2d 715, 720 (Pa. Super. 2007) (stating "shall" evinces a mandatory obligation).

Because 204 Pa.Code § 303.10(a)(3)(i) forbids the application of the deadly weapon enhancement to PIC, the court erred in its application herein. Therefore, we must vacate the sentence in part and remand this matter for resentencing. ***Commonwealth v. Devries***, 112 A.3d 663, 671 (Pa. Super. 2015) (holding that because 204 Pa.Code § 303(a)(3)(ix) forbade application of the deadly weapon enhancement to any crime wherein possession of a deadly weapon was an element, trial court erred in applying it to escape as a felony of the third degree, and this Court must vacate the sentence in part and remand for resentencing).

Judgment of sentence vacated; case remanded for resentencing. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2016