J-S49033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JEFFREY A. GOODMAN | |
| Appellant | No. 1833 WDA 2016 |

Appeal from the Judgment of Sentence May 17, 2016
In the Court of Common Pleas of Venango County
Criminal Division at No(s): CP-61-CR-0000213-2015

BEFORE: DUBOW, SOLANO, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 13, 2017**

Appellant, Jeffrey A. Goodman, appeals from the judgment of sentence entered in the Venango County Court of Common Pleas. Following a jury trial, Appellant was convicted of murder in the first degree,[1] and aggravated assault.[2] Appellant was sentenced to life in prison for first degree murder[3] and he was ordered to pay $8,440.00 in restitution. Appellant challenges the sufficiency of the evidence and the discretionary aspect of his sentence. We affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 2702(a)(1).

[3] The trial court found that the conviction for aggravated assault merged with the conviction for first degree murder for sentencing purposes. **See** Trial Ct. Op., 10/21/16, at 1.

We glean the facts from the record. At trial, Police Chief Robert J. Wenner testified, *inter alia*, as follows:

[The Commonwealth:] Were you involved in the investigation into the death of Cathy Goodman?

A. I was.

\* \* \*

Q. Do you recall being dispatched to 142 Charlton Street, in Oil City?

A. Yes. . . .

Q. Do you recall what the dispatch was for at that time? What were you made aware of?

A. I was contacted by Officer [Robert Allen] Meehan, by phone, to advise me that they were responding to a 911 call where a man had indicated he killed his wife and was still inside the house with the rifle.

Q. Did he give you a name at that point in time?

A. The address was familiar to me. I responded, and when I got on the air from my own vehicle, I asked if we were dealing with [Appellant] at 142, and they advised it was.

\* \* \*

Q. Now, upon arriving at 142 Charlton Street, . . . were you the only officer on scene at that point in time?

A. No. Officer Orr and Officer Rembold arrived prior to me . . . .

\* \* \*

Q. What was your first course of action when [Appellant] came out of the residence?

A. I asked [Appellant] to keep his hands up. He said, Wenner, come on, you know me.

* * *

As he came towards us, he made the statements, I done it. I've had enough. I'm done. She's dead.

* * *

Q. What were your observations of when you first entered the residence of 142 Charlton Street?

A. As I crossed the threshold to the rear to that back door, I could smell the odor of gun powder, which is consistent, in my experience, with being discharged inside a home.

I moved through the kitchen area with Rembold . . . behind me. As we moved though the kitchen toward a short hallway. Upon entering the hallway, I began to see some blood spatter and bone fragments on the hall floor and on the hall wall.

As I went into the hallway that leads directly to the front door, with a set of steps to the second—to my left, there was an opening—a wide opening into what I would refer to as a living room or a TV room. And as I moved to my right, I observed the deceased, Cathy Goodman, on the couch with the rifle laying partially on her body and partially on the armrest to the couch.

* * *

Q. Chief Wenner, is there anything, specifically, about the body that you recognized regarding injury?

A. There was extensive injury about the facial area, the skull. The majority of the face was gone. Other than her—the size of her body being consistent with Cathy Goodman, who was also known to me, it would have been difficult, if not impossible, to identify her facial features.

N.T., 3/14/16, at 39-42, 44.

Lieutenant Steven Hamilton testified as follows:

[The Commonwealth:] Now, you were the only person who showed up at the scene regarding evidence collection for the purposes of this crime; is that correct? Initially.

A. Initially, yes.

Q. Who else did you call in to assist you in collection of evidence of this homicide?

A. [A] decision was made that we would call the Pennsylvania State Police, their records and identification unit, to come and assist us with processing the crime scene.

Q. Now prior to their arrival did you at any point in time take a walk-through of the crime scene?

A. Yes, I did.

Q. Who was it that led you through on the walk-through of the crime scene?

A. Chief Wenner . . . .

*    *    *

Q. And you heard Chief Wenner's testimony as to his observations initially when he went through the crime scene himself.

A. Yes.

Q. Do you believe his recollection of the crime scene is a fair and accurate rendition of your walk-through of the crime scene?

A. Yes, it is.

*    *    *

Q. Now we're going to go ahead and move to Photograph No. 10. Next slide if you would please.

- 4 -

Photograph No. 10, could you describe for the jury what that depicts.

A. Yes. This would be the corner of that living room, and you would be looking to the right and that would be the couch that the—Cathy Goodman is laying on, and she's covered with a white blanket there.

Q. Now I'm going to go ahead and have you move to Photograph 11.

Lieutenant, can you please describe for the jury and the [c]ourt what this photograph depicts.

A. This would depict the victim on the couch, along with the firearm, rifle, and this is—her purse is between her and the couch back itself.

Q. Okay. Now, the firearm itself, can you describe what exactly or where it's positioned on the couch.

A. It's positioned with the back end of it on the arm of the couch. And as you can see, the rest of the scope and that area was laying on the arm of Ms. Goodman.

\* \* \*

Q. I'm going to ask you specific questions regarding the crime scene after Cathy Goodman was removed from the couch.[4]

A. Okay.

Q. Is there anything in particular that came to your attention upon her removal from the couch?

A. Yes, there was.

Q. What was that?

---

[4] The victim was taken to the coroner's office in Erie. *Id.* at 96.

A. We noticed a hole in the couch that would be at the back of the couch.

Q. If we could move to Commonwealth's Exhibit 5, Photograph No. 14. Now, what does [it] depict?

A. It shows the exit—the trajectory the bullet took from front to back. This would be the photograph of the back of the couch, and it's showing the fibers that are coming out of the hole in that direction.

Q. Was there a hole in the front of the couch?

A. Yes, there was.

Q. Did the trajectory of the hole in the front of the couch line up with the hole in the back of the couch?

A. Yes, it did.

Q. What was the significance of the fibers hanging out, as you described, in the hole in the back of the couch?

A. With the fibers hanging out, you could tell that's the direction the bullet went. That was an exit—the back of the couch is an exit; the front of the couch is an entrance. . . .

*Id.* at 65-66, 80-81, 96-97.

Dr. Eric Vey, of the Erie County coroner's office, "testif[ied] as an expert in the field of anatomical pathology and forensic pathology." N.T., 3/15/16, at 148.

[The Commonwealth:] What was revealing, when you first saw this body, as to the extent of her injuries?

A. The overwhelming first impression was that she had sustained massive destruction to her head as a result of a gunshot wound. It was difficult to get an accurate assessment of her overall height because, essentially, the top half of her skull had been exploded as a result of the

gunshot wound so that multiple fragments of skull were no longer in their normal anatomic position.

In other words, . . . we had multiple resected fragments. That means that pieces that were normally in a place that they were supposed to be were displaced elsewhere.

Same thing with [sic] there was a large fragment of her scalp that had been resected as a result of the gunshot trauma too. So, essentially, from the level of her eyebrows up, everything was either collapsed in or resected out. So there was no bony structure left to the top of her head above the level of the eyebrows. And that was, again, as a result of the explosive effect from the gunshot wound.

The other thing I was going to say was that as a result of this explosive destruction to her head, the majority of her brain had been evacuated from her skull and was not present in her head at the time of the autopsy. The only thing left in her head, as far as central nervous system tissue went, was cerebellum and a little bit of brain stem.

\* \* \*

Q. Also, at the time of the examination did you notice any other, what looked like, gunshot wounds to any extremity in addition to her head?

A. Yes. She had a gunshot wound through and through—in other words, in one side and out the other—on the back of her right hand right over the pinky finger. . . . So there was, in association with that, a number of the skeletal structures—in other words, bones of the hand—had been blown out of that area as well.

Now, significantly, associated with this entrance wound right here, there were little punctate—in other words, little punched out—superficial abrasions scattered on the skin.

This is significant with respect to gunshot wounds because it provides a telltale assessment regarding the nature of those punctate abrasions. That's called powder

tattooing or powder strippling. So that when a gun is discharged, coming out of the end of the muzzle, in addition to the bullet coming out, little fragments of burnt and unburnt powder, sort of like grains of pepper, come out as well.

And depending on how far away the end of the muzzle is from the target beyond a certain distance, those little grains [sic] pepper, the flakes of burnt and unburnt powder will, early on, have enough energy to impact the skin, but once you get beyond a certain range, they'll fall away. They no longer have enough kinetic energy to make it to the skin surface.

So when there's no powder tattooing, that defines what's termed, in forensic pathology, as a distant gunshot wound. When there is powered tattooing, that's diagnostic of an intermediate—or medium—range gunshot wound. And there are certain distances for handguns and rifles, in general, that allow a determination of range of fire. In other words, how far the end of the muzzle was to the target.

Now, based upon the presence of powder tattooing with a rifle, the distance then between the end of the muzzle—or the end of the barrel of the rifle to the hand that was struck by this gunshot wound is roughly between a foot and a half and 2 feet—I'm sorry, a foot and a half to $2^1/_2$ feet. Beyond $2^1/_2$ feet, there's no longer enough kinetic energy associated with those little grains of pepper, the burnt and unburnt powder that comes out of the muzzle, to allow them to make it to the skin surface. They just fall away.

So that's it, between about a foot and a half to 2 feet is the distance, based on the presence of the powder tattooing or the powder stippling that was present on her hand, in association with the bullet hole, scattered around there little punctate abrasions, like little salt and pepper grains imbedded right in the skin, you can't wash them away, a foot and a half to $2^1/_2$ feet. . . .

*     *     *

Q. I'd like you to maybe identify, in your opinion, based on your examination, what the path of the bullet was in this case. Striking what part of her body first, then second, and then where the exit wound was.

A. Again, this case presented a challenge because, typically, with a handgun wound to the head at intermediate range you don't get the degree of destruction to the head as you would get with a—with a high-power or hunting rifle. That has a lot more—a lot more umph behind it. So it became difficult because there was multiple—there were multiple large, gaping lacerations and complete disfigurement of the head from the level of the eyebrows to what was left above that.

But it's possible, with collection of the pieces of scalp from the scene and then putting the large lacerations back together again, to establish where the entrance was. That entrance was located about 3 centimeters to the right, which is roughly—there's $2^1/_2$ centimeters in an inch. So that's about an inch and a quarter to the right of the midline, or the middle, of her forehead. And it was 8 centimeters, roughly, which is roughly—8 centimeters is about $3^1/_4$ inches above the bridge of the nose.

\* \* \*

So the overall path of this bullet, as it went through her head, was from her front to her back and her right to her left.

Q. On her body, was the first place it entered the head?

A. Well, this case presented evidence that, in fact, there was—we also had some stippling on her—some powder tattooing on her right and left upper forehead. But given the dense concentration of powder tattooing on her hand and the sparse distribution of the powder tattooing on her forehead, it looks as if the—Mrs. Goodman actually put her hand up in an attempt to shield herself.

\* \* \*

Q. [D]o you have a determination as to the cause of death in this case?

* * *

A. The determination is that Cathy Goodman died as a result of a gunshot wound to the head.

* * *

Q. [A]s specifically as possible, could you please list, again, the traumatic events to the head that caused you to form your opinion.

A. Well, we had the entrance to the right upper forehead region, and then there was extensive destruction to the skull and scalp with multiple displaced and resected skull and scalp fragments and traumatic evacuation of the majority of the brain from the skull as a result of this gunshot wound. Therein lies the—you know, that is, indeed, the cause of death.

*Id.* at 154-59, 163-64.

At trial, Appellant testified, on cross-examination, as follows:

[The Commonwealth:] [Y]ou don't deny that it was you on the 911 call when you called in to explain that you had just shot your wife?

A. Right.

Q. Okay. And again, during that 911 call, you answered her specific questions, whoever you were talking to, and followed her direction to go out the back door of the house when the police had arrived?

A. Yes.

* * *

Q. When you were taken into custody, was Chief Wenner at least there?

- 10 -

\* \* \*

A. I believe he was.

Q. And you were still on the phone, even as you came out of the residence, and that's why it was found in the driveway where it was with the pictures that the Commonwealth offered, correct?

A. Yes.

Q. It was there that you first indicated to the Oil City PD in answering, I don't have a gun. I shot my wife. It's inside.

A. Yes.

\* \* \*

Q. You told Chief Wenner that night, on the video, that Cathy had been sleeping on the couch for the last four or five days; is that correct?

A. Yes.

\* \* \*

Q. And you also said, and I believe I saw on the video itself, that what really angered you was when she laughed at you. Do you remember that?

A. Yes.

\* \* \*

Q. Let me ask you this: What was it about her laughing that caused you to be so enraged?

A. Everything else, then laughing. You know with the affair, the crabs, being throwed [sic] out, having somebody move into my house.

Q. Your counsel was careful in his questions to say when the shells were put in the gun. I want to be more specific. In the video, you indicated that you went upstairs to the

attic, climbed up on the shelving and got the gun; is that correct.

A. Yes.

Q. At that time there were five shells, I believe, that you also got at the same time in the attic?

A. Yeah.  There was [sic] five in a—that black case thing.

Q. On the way down from the attic, you went to the bedroom, where you took the case and three shells and put them in the drawer of your dresser?

A. Yes.

Q. And in your hand, when you took downstairs [sic] the gun—you had two shells in your hand; is that correct?

A. Yes.

Q. Did you point the unloaded firearm at her first?

A. Yeah.  To get her attention, I bumped her with the gun—unloaded gun.

Q. Okay.  And you still had the two bullets in your hand?

A. Yes.

Q. And when she laughed at you, you took one of the bullets, put it into the breach of the gun and you activated the slide action on it to load it, correct?

A. Yes.

*     *     *

Q. [W]hy would you put a loaded cartridge into the breach action of this gun, slide the lever, and point the gun at her head then if you had no intention to shoot her?

A. At that time there was.

Q. You did have the intention at that time?

A. Because of after the affair and, you know, getting me throwed [sic] out of the house.

Q. On the video, we heard that after the first shot you slid the action again, ejected the spent casing, and then put the other live shell in, activating the lever to reload the gun.

A. Yes.

Q. Why did you do that?

A. It was for me.

Q. Well, you said in the video that you—

A. Right.

Q. —weren't contemplating committing suicide at any point.

A. Right.

*    *    *

Q. Were you telling the truth that night, on the night you shot her, within two hours afterwards, or are you telling the truth here today?

A. Both.

*    *    *

Q. I believe Chief Wenner also asked you in that video that night those questions that if the first round hadn't gotten the job done, you were going to go ahead and reload that second just to make sure the job got done, and you affirmed that for him; is that correct?

A. Yes.

*Id.* at 220-24, 226-29, 231, 233.

On March 16, 2016, following a jury trial, Appellant was convicted of murder in the first degree and aggravated assault. On May 17, 2016, Appellant was sentenced to lifetime imprisonment. Appellant filed a post-sentence motion. Following a hearing, the post-sentence motion was denied. This timely appeal followed.[5] Appellant filed a court-ordered

---

[5] We note that Appellant was sentenced on May 17, 2016. He filed a post-sentence motion on May 27, 2016. On the same date, Appellant filed a motion to request relief to file a supplemental post-sentence motion and a motion for extension of time to file a motion to modify his sentence. On June 17, 2016, the trial court granted the motion and extended the time to file the motion to modify sentence until 20 days after the public defender has received all court ordered transcripts. The Pennsylvania Rules of Criminal Procedure provide, *inter alia*, as follows:

> The defendant may file a supplemental post-sentence motion in the judge's discretion as long as the decision on the supplemental motion can be made in compliance with the time limits of paragraph (B)(3).

Pa.R.Crim.P. 720(B)(1)(b). The time limits provide as follows:

> Upon motion of the defendant within the 120-day disposition period, for good cause shown, the judge may grant one 30-day extension for decision on the motion. If the judge fails to decide the motion within the 30-day extension period, the motion shall be deemed denied by operation of law.

Pa.R.Crim.P. 720(B)(3)(b); Pa.R.Crim.P. 720(B)(3)(a) (setting forth general rule that post sentence motions be decided in 120 days). Instantly, the supplemental post sentence motion was filed on July 19, 2016. A hearing was scheduled for August 30, 2016. The Commonwealth requested a continuance which the court granted on September 14, 2016. A hearing was held on October 12, 2016. The post sentence motions were denied on October 21, 2016. Thus, the court timely decided the motion within the thirty-day extension period. ***See id.***

Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and the trial

court filed a Pa.R.A.P. 1925(a) opinion.[6]

Appellant raises the following issues for our review:

The evidence in this case was insufficient to support the murder and aggravated assault charges.

The sentence in this case was manifestly excessive and clearly unreasonable when the court sentenced [Appellant] to a period of incarceration and did not take into account mitigating factors such as [Appellant's] background and the nature of the crime.

Appellant's Brief at 2.

First, Appellant challenges the sufficiency of the evidence to support

the murder charge. He avers that

no direct evidence was presented which directly linked him to the possession of the firearm and the firing of it at the time that the victim was shot. Further, no direct physical evidence was presented that linked the firearm found at the scene of the crime to the killing of the victim. No direct evidence was presented to prove that [Appellant] had the requisite intent, mental state, or malice to kill Mrs. Goodman.

* * *

[Appellant] points out that even though law enforcement could have tested the bullet and firearm for fingerprints linking him to holding that weapon or to ballistic tests to prove that the bullet that killed Mrs. Goodman was actually fired out of that particular weapon, none of those tests were run. Therefore, the Commonwealth was unable to link the shooting to [Appellant]. Further, [Appellant] seemed to be on good

---

[6] We note the trial court's Rule 1925(a) opinion incorporated its October 21, 2016 opinion disposing of post-sentence motions.

terms with Mrs. Goodman, with no ill will stated to anyone that he was intending on harming her, so no evidence of a first degree intentional murder was actually presented.

While [Appellant] stated that the gun went off in his hands, this does not confirm intent. [Appellant's] case seems to involve a heat of passion type of murder, rather than a premeditated, intentional killing, as [Appellant] was arguing with his wife and had previously learned that she was having an affair with someone else.

*Id.* at 14-15.

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. . . .

\* \* \*

When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Ratsamy***, 934 A.2d 1233, 1235-37 (Pa. 2007) (citations and quotation marks omitted).

Section 2502(a) of the Crimes Code defines first degree murder:

**(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502(a).

The Pennsylvania Supreme Court has stated:

> In order to sustain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill, *i.e.*, the killing was performed in an intentional, deliberate, and premeditated manner. Specific intent may be established through **circumstantial evidence**, **such as the use of a deadly weapon on a vital part of the victim's body**.

*Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (citations omitted and emphasis added). "[T]he intent to kill may be formulated in seconds." *Commonwealth v. Baez*, 759 A.2d 936, 938 (Pa. Super. 2000)

The trial court found the evidence was sufficient to sustain a conviction for first degree murder. The court opined:

> [T]here was a considerable amount of testimony and tangible evidence dedicated to establishing the physical circumstances of Cathy Goodman's death. . . . Moreover, [Appellant] admitted via his voluntary statements to the police immediately following the incident that he did in fact shoot his wife, and he confirmed this fact on the stand both via direct testimony and on cross examination.
>
> *       *       *
>
> [I]t was essentially uncontroverted at the time of trial that [Appellant] shot the victim; indeed, the only defense [Appellant] seriously advanced was whether he possessed the requisite *mens rea* to establish first degree murder. . . . In any event, the Commonwealth may sustain its burden by wholly circumstantial evidence. As such, we find the evidence more than sufficient to uphold the jury's verdict both with respect to whether [Appellant] killed the victim and with respect to [Appellant's] mental state in so doing.

Trial Ct. Op. at 4-5 (citations omitted).

Dr. Vey testified that Mrs. Goodman died as a result of a gunshot wound to the head. A conviction for first-degree murder can be sustained based upon circumstantial evidence where a deadly weapon was used on a vital part of the decedent's body. *See Ramtahal*, 33 A.3d at 607. The intent to kill can be formulated in an instant. *See Baez*, 759 A.2d at 939.

Moreover, Appellant's suggestion that the killing case involved a heat of passion defense warrants no relief. The jury was instructed on voluntary manslaughter and was free to discredit Appellant's testimony that the killing occurred during an argument regarding a previous affair. Even if the jury concluded that an argument occurred, there was a reasonable basis for the jury to conclude that Appellant did not actually respond in the heat of passion. *See Commonwealth v. Marks*, 704 A.2d 1095, 1099 (Pa. Super. 1997) ("The test for a heat of passion defense used to reduce the degree of the offense is 'whether a reasonable man, confronted with the same series of events would become impassioned to the extent that his mind would be incapable of cool reflection.' Further, if sufficient provocation exists, the fact-finder must determine whether the defendant actually acted in the heat of passion." (citations omitted)). The jury was also entitled to find that the argument was an insufficient provocation to warrant a reduced conviction for voluntary manslaughter, as Appellant knew the affair before the argument preceding the killing. *See Commonwealth v. Walker*, 656 A.2d 90, 92

(Pa. 1994). Thus, we find no relief is due. *See Ratsamy*, 934 A.2d at 1235-36; *Widmer*, 744 A.2d at 751.

Appellant avers the evidence was insufficient to support his aggravated assault charge. He "again, argues that there was no proof presented by the Commonwealth that he was intending for any sort of serious bodily injury to happen to Mrs. Goodman, or even that he was the person who shot the gun that night." Appellant's Brief at 15.

"A person is guilty of aggravated assault if he . . . causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702 (a)(1). The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. "Bodily injury" is defined as "impairment of physical condition or substantial pain." *Id.* "The intent to cause serious bodily injury may be proven by direct or circumstantial evidence." *Commonwealth v. Martuscelli*, 54 A.3d 940, 948 (Pa. Super. 2012).

In *Commonwealth. v. Fortune*, 68 A.3d 980 (Pa. Super. 2013) (*en banc*), this Court found there was sufficient evidence to sustain a conviction for aggravated assault where the appellant

> appeared before the victim without warning, pointed a gun
> at the middle of her forehead, demanded her keys, and

threatened to blow [her] head off if she did not comply. The victim indicated that [the a]ppellant grasped one end of keys while she held a key in her hand. She also estimated that the gun was less than a half inch from the area between her eyebrows at the time. Under such circumstances, [the a]ppellant was not merely pointing the gun at the victim while making a conditional threat. Rather, his simultaneous demand to her to act was direct and uttered while he constantly pointed his weapon squarely at a vital part of her body and while he was holding the opposite end of the keys that were also still in her hand. As such, we find there was sufficient evidence from which a jury could have found that [the a]ppellant attempted to cause serious bodily injury upon the victim.

We further find there was sufficient evidence from which the jury could have concluded that [the a]ppellant took a substantial step towards inflicting serious bodily injury since he pointed a gun at the middle of the victim's forehead, threatened to kill her, and did not do so only because the victim fled. The only remaining step [the a]ppellant would have had to take to inflict serious bodily injury upon [the victim] would have been to pull the trigger on the gun, which would have obviously caused serious bodily injury.

*Id.* at 986-87 (citations and quotation marks omitted).

Instantly, the trial court opined:

We find the sufficiency argument as it relates to [aggravated assault] unavailing on similar grounds [as to the conviction for first degree murder]. . . . Given the jury's verdict, and the Commonwealth's entitlement to every reasonable inference to be drawn therefrom, we find that [Appellant's] shooting the victim, thereby causing her death, form an adequate evidentiary basis to sustain his conviction [for aggravated assault].

Trial Ct. Op. at 5-6.

In the case *sub judice*, Appellant inflicted serious bodily injury having

killed the victim with a gunshot wound to her head. ***See Fortune***, 68 A.3d

at 986-87; **Martuscelli**, 54 A.3d at 948. We find no relief is due. **See**

**Ratsamy**, 934 A.2d at 1235-36; **Widmer**, 744 A.2d at 751.

Lastly, Appellant challenges the discretionary aspect of his sentence. Appellant contends

> that he should receive a maximum sentence not to exceed twenty years, and a parole date not to exceed ten years. **The law provides that a person convicted of first degree murder will receive life imprisonment.** However, [Appellant] requests that the [c]ourt consider mitigating factors, such as his lack of intent, in order to grant him a shorter sentence.

Appellant's Brief at 16 (emphasis added).

The sentence for first degree murder is statutorily mandated as follows:

> **(a) First degree.**—
>
> (1) Except as provided under section 1102.1 (relating to sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer), a person who has been convicted of a murder of the first degree or of murder of a law enforcement officer of the first degree **shall be sentenced to death or to a term of life imprisonmen**t in accordance with 42 Pa.C.S. § 9711 (relating to sentencing procedure for murder of the first degree).

18 Pa.C.S. § 1102(a)(1) (emphasis added). Appellant was convicted by a

jury of First Degree Murder, and as such was sentenced to life in prison.

**See** 42 Pa.C.S.. § 9711 (upon a conviction for first degree murder, the

defendant may either be sentenced to death or life in prison).

"Challenges to a trial court's application of a mandatory sentencing provision implicate the legality of sentence." **Commonwealth v. Foster**, 960 A.2d 160, 167 (Pa. Super. 2008). Since the sentence imposed in this case for first degree murder is a mandatory sentence, there is no basis upon which to appeal the imposition of a life sentence as an abuse of discretion. **See id.**; 42 Pa.C.S. § 9781(a). For all of the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/13/2017