J-S03042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALFRED H. TOURNAY III | : | |
| | : | |
| Appellant | : | No. 467 WDA 2024 |

Appeal from the Judgment of Sentence Entered November 20, 2023
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0000773-2021

BEFORE: KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                                    **FILED: April 22, 2025**

Alfred H. Tournay ("Tournay") appeals from the judgment of sentence imposed by the Westmoreland County Court of Common Pleas ("trial court") following his convictions of aggravated assault, terroristic threats, and simple assault.[1] On appeal, Tournay challenges the sufficiency of the evidence to support his aggravated assault conviction as well as the discretionary aspects of his sentence. Upon review, we affirm.

This case involves an incident that began at the residence of Dana Sikora ("Sikora") in the early morning on December 17, 2020. Sikora woke up at 4:30 a.m. to get ready for work. N.T., 5/2/2023, at 84. Upon noticing her street was covered with snow, she called her boss to inform him that she

_____

[1] 18 Pa.C.S. §§ 2702(a)(1), 2706(a)(1), 2701(a)(1).

would be late that day. *Id.* She then went back to her room to lie down. *Id.* Tournay, who was living with Sikora at that time, subsequently entered Sikora's room without her permission. *Id.* at 88. She immediately told him to leave. *Id.* Tournay left the room and Sikora got up and locked the door behind him. *Id.* At that point, Sikora heard screaming and glass breaking. *Id.* at 84. She opened her door and saw glass outside of it, so she began to clean up the glass. *Id.* at 85. Tournay approached her suddenly, screaming at her, and proceeded to push her to the ground. *Id.* He continued screaming at her, calling her a "mother fucking bitch" and "mother fucking asshole." *Id.*

Tournay then threw a speaker at Sikora, which resulted in an injury to her face that began bleeding. *Id.* Sikora went to her bathroom to address the bleeding; Tournay followed her, threw a brush and a candle at her, and kicked a vase in the bathroom. *Id.* Sikora left the bathroom to retrieve her phone and call 911. *Id.* at 86. Tournay followed her again and said, "Do you think you can call 911? You think that's going to stop me?" *Id.* He pushed Sikora down again and began kicking her, causing her eye to bleed. *Id.* Tournay said, "Your kids are going to find you dead in your own house, in your own blood. What do you think?" *Id.* At that point, Sikora grabbed her phone, pushed Tournay, and ran out the front door. *Id.* Tournay followed Sikora outside, grabbed her phone from her, and threw it into the snow. *Id.* He then pushed Sikora's head into the snow and stated, "I'm going to kill you,

you mother fucker. I'm going to kill you." *Id.* at 86-87. He stated something to Sikora about how she had killed his dog.[2] *Id.* at 90.

Tournay abruptly stopped pushing Sikora's head into the snow, got up, and went back inside Sikora's house, but continued screaming from the inside of the house. *Id.* at 91. Sikora located her phone in the snow and answered an incoming call from a 911 operator. *Id.* at 87. The operator asked Sikora if there was anywhere she could hide, and Sikora proceeded to get up and walk down her steps. *Id.* at 87, 91. Subsequently, Sikora's neighbor Kelly Ferraro ("Kelly") came outside to start her car, saw Sikora, and asked if she was okay. *Id.* at 87, 117. Tournay then came outside onto Sikora's porch and yelled at Kelly to go back inside her house. *Id.* at 92, 118. Tournay then ran down the stairs yelling in Kelly's direction, "I'm going to kill you, you mother fucker." *Id.* Kelly went inside her house, where her husband Bill Ferraro ("Bill," and together with Kelly "the Ferraros") was in their bedroom, and shut the door. *Id.* at 119-120. Tournay approached the Ferraros' front door and began kicking it very hard. *Id.* at 93, 119. Though Kelly had locked the door, Tournay ultimately kicked the door open. *Id.* at 119, 122.

Tournay entered the home and cornered Kelly in her dining room. *Id.* at 123. He began to punch her in the face and threatened to kill her. *Id.* at 123-24. As Kelly screamed at Tournay, telling him to get out of her house,

---

[2] Sikora later clarified that he did not have a dog while living with her. N.T., 5/2/2023, at 91.

- 3 -

Bill left the bedroom and yelled at Tournay to get away from Kelly. *Id.* at 124-25. Tournay walked away from Kelly and toward Bill, who was now in the kitchen, and punched the glass out of a hutch in the Ferraros' dining room as he walked. *Id.* at 125-26. Tournay began "swinging at" Bill, and Bill attempted to defend himself with the cane he used to walk. *Id.* at 128. Kelly saw from the dining room that Bill's cane had been cracked into pieces, presumably by Tournay.[3] *Id.* Tournay then used a piece of the splintered cane to "poke at [Bill's] chest" and repeatedly stated that he was going to kill him. *Id.* At that point, Kelly saw police lights coming up her street, so she ran outside to tell them that Tournay was assaulting Bill inside the house. *Id.* at 129.

Police arrested Tournay. Sikora was taken to the hospital by ambulance, and EMS treated the Ferraros' injuries at the scene.[4] *Id.* at 96, 130. Tournay injured Sikora's eye and Sikora required stitches to close a gash to her forehead. *Id.* at 41, 86-88; *see also id.* at 161-62 (noting Sikora has a visible scar over her left eye from Tournay's kicks to her head). Further, Sikora testified to having a bald spot on her head that that no longer grows hair as a result of Tournay's repeated kicks to her head. *Id.* at 96.

_____

[3] Bill had passed away by the time this trial began, and thus only Kelly was able to testify to the events that occurred based on what she was able to see from the adjacent room. N.T., 5/2/2023, at 115.

[4] Bill also received a follow-up CT scan, because "he had a bump on the top of his head" from the altercation with Tournay. N.T., 5/2/2023, at 130.

The Commonwealth charged Tournay with numerous crimes. The case proceeded to a jury trial, after which the jury found Tournay guilty of one count each of aggravated assault (involving Sikora), burglary, criminal trespass, terroristic threats, and criminal mischief, as well as six counts of simple assault. The trial court sentenced Tournay to six and one-half to thirteen years in prison, followed by twelve months of re-entry supervision.

Tournay filed several timely post-sentence motions, which the trial court denied. Tournay then filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Tournay presents the following issues for review:

1. Whether the [trial court] erred in determining the Commonwealth produced sufficient evidence to convict [Tournay] of aggravated assault when the victim suffered no serious bodily injury and the evidence did not support the notion [that] [Tournay] intended to cause serious bodily injury?

2. Whether the [trial court] erred in enhancing [Tournay's] sentence by considering a probation violation as evidence of [Tournay's] non-compliance with supervision and non-amenability to treatment without knowing the basis for the violation?

Tournay's Brief at 2.

## **Sufficiency of the Evidence**

Tournay contends that the evidence was insufficient to support his aggravated assault conviction because Sikora did not sustain serious bodily injury and the Commonwealth failed to prove he intended to cause serious bodily injury. *Id.* at 8. He first argues that Sikora's injuries, which included

"a slight bald spot [and] a small scar above her left eye," do not rise to the level of "*serious* permanent disfigurement as described in 18 Pa.C.S.[] § 2301." ***Id.*** at 11. He likens Sikora's injuries to those sustained by the victim in ***Commonwealth v. Benaglio***, 385 A.2d 544, 546 (Pa. Super. 1978), where this Court held that a "bump on the head" was insufficient to sustain an aggravated assault conviction. Tournay's Brief at 11.

Tournay further contends that the Commonwealth failed to prove that he had the requisite mens rea to sustain an aggravated assault conviction. ***Id.*** Specifically, he argues that the Commonwealth did not prove that he acted with "the requisite intentionality" to cause serious bodily injury, as it did not prove that he acted with intent to cause injury "only one step short of murder." ***Id.*** at 12. (citation omitted). He adds that had he intended to seriously injure Sikora, "he had ample opportunity" to do so during this incident. ***Id.*** at 13. Tournay concludes that the totality of the circumstances and the minimal nature of Sikora's injuries indicate that the Commonwealth did not meet its evidentiary burden for an aggravated assault conviction, and that the record instead suggests he is guilty of simple assault. ***Id.***

Our standard of review of a challenge to the sufficiency of the evidence is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all the reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact

finder. The evidence may be entirely circumstantial as long as it links the accused to a crime beyond a reasonable doubt.

*Commonwealth v. Juray*, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted).

A person commits aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). Serious bodily injury is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. To sustain a conviction for aggravated assault, the Commonwealth is only required to prove that the defendant attempted to cause serious bodily injury to another person and thus need not prove that serious bodily injury actually occurred. *Commonwealth v. Rosario*, 307 A.3d 759, 765 (Pa. Super. 2023) (citation omitted). Specifically, "[a]n attempt under [s]ubsection 2702(a)(1) requires some act, albeit not one causing serious bodily injury, accompanied by an intent to inflict serious bodily injury." *Commonwealth v. Fortune*, 68 A.3d 980, 985 (Pa. Super 2013) (citations omitted).

A "defendant's intent to inflict serious bodily injury can be gleaned from the other circumstances surrounding the defendant's attack on the victim." *Commonwealth v. Burton*, 2 A.3d 598, 602 (Pa. Super. 2010) (en banc) (citation and quotation marks omitted); *see also Commonwealth v.*

*Martuscelli*, 54 A.3d 940, 948 (Pa. Super. 2012) (noting the Commonwealth can prove intent by direct or circumstantial evidence). Such circumstances include:

> evidence of a significant difference in size or strength between the defendant and the victim, any restraint on the defendant preventing him from escalating the attack, the defendant's use of a weapon or other implement to aid his attack, and his statements before, during, or after the attack which might indicate his intent to inflict injury.

*Commonwealth v. Alexander*, 383 A.2d 887, 889 (Pa. 1978); *accord Burton*, 2 A.3d at 602. The reviewing court may also consider whether the attack surprised an "unsuspecting victim," therefore preventing the victim's ability to protect themselves. *Commonwealth v. Patrick*, 933 A.2d 1043, 1047 (Pa. Super. 2007).

Here, the trial court held that the Commonwealth provided sufficient evidence for the jury to find that Tournay caused serious bodily injury to Sikora. Trial Court Opinion, 3/20/2024, at 10. This evidence included Sikora's testimony that Tournay pushed, struck, and kicked her repeatedly, and that she was taken to the hospital after this incident and received stitches above her left eye. *Id.* Further, the court noted that the jury saw a video recording of the incident, as well as photographs of Sikora's injuries from her hospital admission and a scar over Sikora's left eye that was still visible two years after the assault. *Id.* at 11. The court added that Sikora testified about a bald spot on her head where the Tournay had kicked her. *Id.* The court thus concluded that there was sufficient evidence for the jury to conclude that Sikora's facial

scarring and/or her bald spot constituted serious permanent disfigurement, therefore evincing the serious bodily injury she sustained due to Tournay's actions. *Id.*

Further, the trial court found that the Commonwealth presented sufficient evidence for the jury to find beyond a reasonable doubt that Tournay acted with intent to inflict serious bodily injury upon Sikora. *Id.* It noted that the testimony and evidence demonstrated that "[Tournay's] assault of Sikora was completely unprovoked, and [Tournay] continuously pursued Sikora as she attempted to flee." *Id.* Further, the court pointed to evidence provided regarding Tournay's statements to Sikora indicating his intent to cause her serious bodily injury, like, "Your kids are going to find you dead in your own house in your own blood," and, "I'm going to kill you." *Id.* The court also noted that Tournay threw multiple objects at Sikora, pursued her outside after she tried to flee, and pushed her head into the snow. *Id.* The court concluded that Tournay's words and actions demonstrated his intent to cause serious bodily injury to Sikora. *Id.* at 11-12.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we conclude that, at the very least, Tournay attempted to cause serious bodily injury to Sikora and acted with the requisite intent. *See* 18 Pa.C.S. § 2702(a)(1). The evidence establishes that Tournay pushed Sikora to the ground numerous times, threw large, hard objects at her, and repeatedly kicked her in her face and her head. As a result, Tournay injured

her eye and caused a gash to her forehead that bled heavily and led to a visible scar. Tournay kicked her so hard and so many times in the head that Sikora now has a bald spot on her head that no longer grows hair. N.T., 5/2/2023, at 96. There is no question that repeated strikes to a person's head and eye can cause serious bodily injury. *See, e.g., Commonwealth v. Lewis*, 911 A.2d 558, 564-65 (Pa. Super. 2006) (sustaining aggravated assault conviction where defendant struck victim's face repeatedly, causing swelling of her eye and numerous lacerations, among other injuries).

Additionally, at various times throughout the assault, Tournay told Sikora that he was going to kill her and that her children would find her dead in her own blood. Furthermore, when Sikora's neighbor Kelly attempted to assist her, Tournay began pursuing Kelly, threatening to kill her, forcibly entering her home, and then attacking her husband who attempted to come to Kelly's aid. Tournay's repeated threats to Sikora's life, in the context of his conduct, "indicate[d] his intent to inflict further injury upon the victim." *Alexander*, 383 A.3d at 889; *see also Burton*, 2 A.3d at 603 (finding a defendant's statements can demonstrate an intent to harm).

Tournay's reliance on *Commonwealth v. Benaglio* is misplaced, as the defendant in that case punched the victim one time during the course of a robbery, after which she sustained a "bump on the head." *Benaglio*, 385 A.3d at 546. Here, Tournay engaged in a sustained attack, chasing, throwing

objects, and kicking Sikora in the face and head repeatedly while threatening to kill her. Tournay's first claim is without merit.

### Discretionary Aspects of Sentencing

In his second issue, Tournay argues that the trial court abused its discretion by relying on an improper sentencing factor when fashioning his sentence. Tournay's Brief at 14-15. Specifically, Tournay alleges that the court considered "the unknown circumstances behind an alleged probation violation" and used that information to enhance Tournay's sentence and impose consecutive sentences. *Id.*

Tournay challenges the discretionary aspects of his sentence. *See Commonwealth v. Watson*, 228 A.3d 928, 934 (Pa. Super. 2020) (noting that a claim that the trial court considered improper factors in imposing the sentence challenges the discretionary aspects of sentencing). An appellant may not challenge the discretionary aspects of his sentence as a matter of right; rather, he must invoke this Court's jurisdiction of such a claim by satisfying a four-part test:

> (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post-sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of her appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raise a substantial question for our review.

*Commonwealth v. Rivera*, 312 A.3d 366, 376-77 (Pa. Super. 2024) (citation and brackets omitted).

Here, Tournay properly preserved this issue in a post-sentence motion and filed a timely notice of appeal. He did not, however, include statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f). Furthermore, the Commonwealth objected to Tournay's failure to include a Rule 2119(f) statement in his brief. Commonwealth's Brief at 21. Therefore, we cannot review Tournay's discretionary aspects of sentencing claim. *See Rivera*, 312 A.3d at 377 (concluding that appellant's discretionary aspects of sentencing challenge is waived where he fails to include a discretionary sentencing issue in his Rule 2119(f) statement, and the Commonwealth objects).

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/22/2025